1  Erika L. Lee
2  1054 E. Turmont St.
   Carson, CA 90746(646)552-8394
3  Email: erikallee@hotmail.com
4  ERIKA L. LEE, PRO SE PLAINTIFF

```
                    FILED
          CLERK, U.S. DISTRICT COURT

                JUN 16 2021

          CENTRAL DISTRICT OF CALIFORNIA
          BY                    DEPUTY
```

7               UNITED STATES DISTRICT COURT

8            CENTRAL DISTRICT OF CALIFORNIA (WESTERN)

| | |
|---|---|
| 10 | **CASE No.: 2:20-cv-08754-CBM(JEMx)** |
| 11 | **AMENDED VERIFIED COMPLAINT** |
| | **1) DEFAMATION**(LIBEL AND SLANDER) |
| 12 **ERIKA L. LEE,** | **2) HOSTILE WORK ENVIRONMENT** (disability, sex, race) |
| Plaintiff, Pro Se | **3) RETALIATION**(REQUESTING REASONABLE |
| 13 | ACCOMMODATIONS, APPLYING FOR FMLA, |
| | DISABILITY, TESTIFYING IN ANOTHER |
| 14 v, | EMPLOYEE'S SEX DISCRIMINATION CASE, |
| | engaging with attorney to FILE WORKER'S |
| 15 **DELTA AIR LINES, INC., JOSEPH** | COMPENSATION CLAIM, opposing SEX |
| **TURNPAP, & ASHLEY RANGEL, &** | DISCRIMINATION, opposing RACIAL |
| 16 **DOES 1-10** | DISCRIMINATION, opposing ADA discrimination) |
| | **4)FAILURE TO PREVENT DISCRIMINATION,** |
| 17 | **HARASSMENT, & RETALIATION** |
| Defendants | **5) INTENTIONAL INFLICTION OF EMOTIONAL** |
| 18 | **DISTRESS** |
| | **6)NEGLIGENT HIRING, SUPERVISION, and** |
| 19 | **RETENTION** |
| | **7)VIOLATIONS OF TITLE VII** (SEX, RACE, |
| 20 | DISABILITY, COLOR, RETALIATION, HOSTILE |
| | WORK ENVIRONMENT ) |
| 21 | **8)RACIAL DISCRIMINATION IN VIOLATION OF** |
| | **42 USC 1981** (RETALIATION, HOSTILE WORK |
| 22 | ENVIRONMENT, DISCRIMINATION, FAILURE TO |
| | PROMOTE, DISPARATE TREATMENT) |
| 23 | 9)FAILURE TO INTERACT (FEHA ,ADA. SB 400) |
| | 10)FAILURE TO ACCOMMODATE (FEHA, ADA, SB |
| | 400)( VIOLATION OF S.B.400, 230, 230.1.98.7) |
| 24 | **11)VIOLATIONS OF  FMLA/CFRA** |
| | (INTERFERENCE & RETALIATION) |
| 25 | **12)VIOLATION OF 52.1** |
| | **13)VIOLATIONS of Labor Codes 1102.5, 230&** |
| 26 | **230.1; Cal. Gov't Code § 12945.2; 2 Cal. Code Regs.,** |
| | **tit. 2 § 11069(c) & (d) d)(1); Cal. Gov't Code §** |
| | **12926(p); Cal. Code Regs., tit. 2 § 11065 (p)(2),** |
| | **14)VIOLATION OF Labor Code Section 96(k)** |

27

28  **JURY TRIAL DEMANDED**

---

**THIRD AMENDED VERIFIED COMPLAINT FOR DAMAGES**

"If a plaintiff fails to include dismissed claims in an amended complaint, the plaintiff is deemed to have waived any error in the ruling dismissing the prior complaint.'" (quoting Forsyth v. Humana, Inc., 114 F.3d 1467, 1474 (9th Cir. 1997)).See Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 373 (1966) ("These rules were designed in large part to get away from some of the old procedural booby traps which common-law pleaders could set to prevent unsophisticated litigants from ever having their day in court. If rules of procedure work as they should in an honest and fair judicial system, they not only permit, but should as nearly as possible guarantee that bona fide complaints be carried to an adjudication on the merits."); De Franco v. United States, 18 F.R.D. 156, 159 (S.D. CA. 1955) ("The general purpose of the Federal Rules of Civil Procedure is to see that actions are tried on the merits, and to dispense with technical procedural problems. To fall back on a technicality and refuse to permit a case to come to issue on the merits is to sap the very heart out of the rules and to obviate the very purpose for which they are intended."); A defendant may raise the time bar of the statute of limitations by motion to dismiss only if it is obvious on the face of the complaint that the claim is time-barred, or if affidavits accompany the motion. See, e.g., Jablon v. Dean Witter Co., 614 F.2d 677, 682 (9th Cir. 1980).

## RELATION BACK

Plaintiff is entitled to RELATION BACK on her FMLA claims as it is based on Defendants revoking of Plaintiff's "swapping benefits" "were revoked" "which prevented Plaintiff from earning income " and hours. (see DKT #1, page 4, lines 27-28, page 5, Line 1)  Plaintiff's FMLA interference and retaliation claims are NOT time-barred before December 28, 2018 because December 28, 2018 was not the "last event constituting the alleged violation for which the action is brought." MARCH 30, 2020 was the "last event constituting the alleged violation for which the action is brought," which was less than 2 years.  Defendants' October 2018 Conduct was willfully orchestrated and perpetuated upon Plaintiff to intentionally retaliate and intentionally interfere with Plaintiffs current 2018 FMLA claim,and future 2019 FMLA leaves .. in December/2019 after Plaintiff told Defendants that she had a serious medical condition that qualified for FMLA in 2018.  The Court did not apply the statue correctly and/or perhaps didn't understand the purpose of Delta's swapping benefits is mainly to pick up enough hours to qualify for FMLA.  Def. Delta revoked Plaintiff's swapping benefits in October 2018 to make sure Plaintiff would not qualify for FMLA benefits the next October 2019 when Plaintiff would be eligible with her qualifying serious medical condition (migraines). Under 29 U.S.C. § 2617(c)(1), an action may be brought under the FMLA "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." If the alleged violation is willful, "such action may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought." Id. § 2617(c)(2). In this case, Plaintiff alleges that Defendant terminated his employment on July 9, 2013. Compl. This is the date of the last event constituting the alleged violation of his FMLA claims. Defendants conduct was willful as Delta has a systemic pattern and practice of taking  away swapping benefits to intentionally interfere with FMLA rights (see authenticated evidence attached  to SAC, DKT #28, declaration of Aasir Azzarmi, Stephanie Acosta, deposition of Sharon Lewis ).  Defendants willfully did this to Plaintiff after she told Defendants she had a qualifying serious medical condition and wanted to exercise her rights under " FMLA.".  Delta did " know, " and did "show reckless disregard  for whether, its conduct was prohibited by the statute " as this is a pattern and practice of Delta's that happened to other Delta employees the same way it happened to plaintiff .  (see authenticated evidence attached  to SAC, DKT #28, declaration of Aasir Azzarmi, Stephanie Acosta, deposition of Sharon Lewis ) The court would have to apply the willful test but would be unable to now, without discovery as plaintiff has no knowledge of Defendants "decision to  consult with its' legal  department concerning Olson's  status" and the other willful factors don't apply Bc plaintiff was already " back to  work" when Defendants interfered with Plaintiff's FMLA rights and retaliated against her for attempting to exercise her rights under the FMLA.  Also, because defendants interfered with Plaintiff FMLA rights to prevent Plaintiff from taking a FMLA leave,  Defendants never provided "payment for hours worked while  Olson was out on FMLA leave."  Olson v. United States, 980 F.3d 1334 (9th Cir. 2020) Therefore the 9th circuits willful test does not apply to Plaintiff's FMLA  claims Bc the circumstances are unique to Delta's willfully systemic pattern and practice of FMLA interference and retaliation. Plaintiff is also entitled to equitable tolling on this issue. Plaintiff has "me too" evidence—here, declarations and testimony by other employees on her FMLA claims,  alleging adverse employment actions against other employees for exercising their FMLA rights —may "constitute substantial evidence requiring reversal of [summary] judgment." Johnson v. United Cerebral Palsy/Spastic Children's Found. of Los Angeles & Ventura Ctys., 173 Cal. App. 4th 740, 759 (2009). The record contains such evidence, although some of it was qualified by the declarants in later declarations. Contrary to what Abbott suggests, the submission of those later declarations does not eliminate the need for a trial to sort out the importance of this evidence. (Pineda v. Abbott Laboratories, Inc., No. 19-55019 (9th Cir., Oct. 20, 2020)).

---

**THIRD AMENDED VERIFIED COMPLAINT FOR DAMAGES**

. Cal. Civ. Proc. Code ' 352.1.California's equitable tolling doctrine "applies when an injured person has several legal remedies and, reasonably and in good faith, pursues one." McDonald v. Antelope Valley Community College Dist., 45 Cal.4th 88, 100 (Cal. 2008) . Plaintiff was pursuing Workers Comp remedies first in 2019 and 2020 Timely notice was given to Defendant Delta of these claims.McDonald, 45 Cal.4th at 99, and pursuit of administrative remedies equitably tolls the statute of limitations so long as there was timely notice, lack of prejudice to the defendant, and reasonable, good faith conduct on the part of the plaintiff, at 101-103.Also, Plaintiff's **Intentional Infliction of Emotion Distress** in her Amended Complaints are not time-barred and entitled to relation back because they relate back to the original complaint which was filed on 09/21/2020. In the original complaint, Plaintiff pled that she *"suffered anguish ,humiliation, distress, inconvenience and loss of enjoyment of life because of Delta's actions." (DKT#1, page 6, page 7 ),* Plaintiff pled facts in her Original Complaint about her IIED claim, which was based on Defendants violations of FEHA, Title VII, ADA, 1981, which were regarding the race, sex, disability discrimination and retaliation. ...Plaintiffs IIED claim related back to original complaint filed on 09/21/2020 where Plaintiff pled emotional distress in connection with FEHA, Title VII, ADA, 1981 . . See Soliman v. CVS RX Servs., Inc., 570 F. App'x 710, 711 (9th Cir. 2014) . Defendants conduct from 09/22/2020 through June 2021 is not time barred, as Defendants conduct are/were continual violations.. "Damages for emotional distress are inextricably related to the conduct causing that distress. The more aggravated the conduct, the larger the award of damages is likely to be." Kardly v. State Farm Mut. Auto. Ins., 255 Cal. Rptr. 40, 43 (Ct. App. 1989). . The plaintiff's subjective account is sufficient where, as here, *"the circumstances . . . make it obvious that a reasonable person would suffer significant emotional harm."* In re Dawson, 390 F.3d 1139, 1150 (9th Cir. 2004). Indeed, it would be unusual for an employee not to suffer emotional distress as a result of an unfavorable decision by his employer. (Cf. Magnuson v. Burlington Northern, Inc. (9th Cir. 1978) 576 F.2d 1367, 1369 *["[e]very employee who believes he has a legitimate grievance will doubtless have some emotional anguish occasioned by his belief that he has been wronged"].*); **Cole v. Fair Oaks Fire Protection Dist. (1987) 43 Cal.3d 148 , 729 P.2d 743; 233 Cal.Rptr. 308.** . see also Zhang v. American Gem Seafoods, Inc. 339 F.3d 1020 (9th Cir. 2003);Carey v. Piphus, 435 U.S. 247, 264 n.20 (1978); Patterson v. PHP Healthcare Corp., 90 F.3d 927, 940 (5th Cir. 1996) ("a Title VII emotional distress claim ....is required to sustain a finding for emotional distress under §§ 1981 and 1983.").Plaintiff's **failure to prevent race discrimination claim** was based on Defendants' violation of the 42 U.S.C. 1981 based on race discrimination and the hostile work environment, retaliation, failure to promote, which was pled in original complaint and entitled to relation back.

## TOLLING

Plaintiff filed a workers compensation claim for Emotional Distress going back in late June/early July 2019. The statute of limitations can be tolled when the plaintiff submits a workers' compensation claim for the same injury that gives rise to the FEHA claim filed with the court. See **Elkins v. Derby, 12 Cal. 3d 410, 413 (1974)**.( The California Supreme Court held that the limitations period for the plaintiff's personal injury claim was tolled from the day he filed with the Board to the day the Board's decision became final, noting allowing the newly filed civil complaint to proceed would not frustrate the statute of limitations' primary purpose; to prevent surprise to the defendants. Id. at 413 n.1, 416. The state Supreme Court thus reversed the superior court's holding that plaintiff's personal injury claim was time-barred. Id. at 420.) Therefore, Plaintiff's Intentional Infliction of Emotional Distress "IIED" claim based on disability and sexual harassment, back injury (ADA) claim, workers compensation retaliation (Title VII) is not time-barred and is no surprise to Def. Delta, as it was tolled since July 2019 and Plaintiff's IIED claim goes back to July 2017. Plaintiff has been having counseling sessions with a psychotherapist regarding the sexual harassment and disability harassment and hostile work environment. Defendant Delta and/or it's TPA, Sedgwick CMS, have the doctors reports and notes and have been on notice of this claim since July 2019. " Daviton v. Columbia/HCA HealthcareCorp., 241 F.3d 1131, 1141 (9th Cir. 2001)( "the equitable tolling doctrine requires that the same wrong serve as the predicate for the earlier and later proceedings to make sure defendant received proper notice." Id.)

## CONTINUAL VIOLATIONS DOCTRINE

Under this law, "an employer is liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct that occurred within the limitations period. [Citation.]" (Yanowitz, supra, 36 Cal.4th at p. 1056.) The doctrine applies when: (1) Defendants actions inside and outside the limitations period are sufficiently similar in kind; (2) Defendants acts occurred with reasonable frequency; and (3) Defendants acts had not yet acquired a degree of permanence because Plaintiff was still subjected to the hostile work environment and the sex race and disability harassment/ discrimination, retaliation and Delta's failure to interact/ accommodate in 2021. Also in February 2021, Def. Delta's HR Manager admitted to Plaintiff that Delta never investigated any of her complaints since 2018, thus Delta's failed to investigate was tantamount to taking no reasonable steps to prevent the discrimination, harassment and retaliation that Plaintiff was being subjected to . (Id. at p. 1059.)

**THIRD AMENDED VERIFIED COMPLAINT FOR DAMAGES**

**THE PARTIES**

1. Plaintiff, Erika L. Lee, an individual, (herein referred to as "Ms. Lee" or "Plaintiff" or "Lee"), is a citizen of New York, as she is domiciled in the State of New York, but is/was/has been a California resident since 2011, when she accepted a job opportunity with Defendant Delta Air Lines, Inc. in San Diego, California, and then later began working for Defendant Delta Air Lines in Los Angeles, CA.

2. **Defendant Delta Air Lines, Inc.,** (herein referred to as **"DELTA" or "Defendant Delta"**), is and was at all relevant times herein, a California citizen. Defendant Delta Air Lines Inc, was and is at all times mentioned in this Complaint, both a corporation duly organized and existing under the laws of Delaware and authorized to operate by the State of California and qualified to do business in the County of Los Angeles. Defendant Delta's place of business, where the following causes of action took place, was and is in the County of Los Angeles, at Los Angeles International Airport("LAX"), at 1 World Way, Los Angeles, California, 90045.

3. **Defendant Ashley Rangel** is a California citizen and/or is employed by Defendant Delta Air Lines, Inc. to be the HR Manager of Delta's "LAX" Department 125 airport employees, where the following causes of action took place, in the County of Los Angeles, at Los Angeles International Airport("LAX"), at 1 World Way, Los Angeles, California, 90045. Defendant Rangel, not only conducts business on behalf of her employer, Defendant Delta Air Lines, Inc. in this judicial district, but Def. Rangel is and was at all relevant times herein a California citizen and/or California resident.

4. Defendant Joseph Turnpap, is a California citizen and/or is employed by Defendant Delta Air Lines, Inc. to be a Manager of Delta's "LAX" Department 125 airport employees, where the following causes of action took place, in the County of Los Angeles, at Los Angeles International Airport("LAX"), at 1 World Way, Los Angeles, California, 90045. Defendant Turnpap, not only conducts business on behalf of his employer, Defendant Delta Air Lines, Inc. in this judicial district, but Def. Turnpap is and was at all relevant times herein a California citizen and/or California resident.

**JURISDICTION AND VENUE**

5. Pursuant to 28 U.S.C § 1331 & 1332, this Court has original *jurisdiction* over Plaintiff's claims due to FEDERAL QUESTION (1981, ADA, Title VII) and additionally based on the parties' diversity of citizenship and because the amount in controversy exceeds $75,000. All Defendants are 100% diverse to Plaintiff, who is domiciled in New York, where she is a citizen of New York. **Venue** is appropriate in this judicial district, pursuant to 28 U.S.C. § 1391 because this Court

1   has personal jurisdiction over Defendants and by reason of the fact that, among other things, this

2   is the judicial district more than 50% of Defendants work and/or reside, *& where events occured .*

3   **Plaintiff's protected status and activity:**

4   6. Plaintiff is black/African American.

5   7. Plaintiff is a female.

6   
7   8. Plaintiff has a disability(mobility impairment) *depression & stress* and told Defendants she had a disability in both

8   September and/or October 2018. *Plaintiff's disabilities are covered by the FEHA and/or ADA.*
    *Plaintiff's migraines are her serious medical condition covered by FMLA/CFRA.*

9   9.Plaintiff engaged with a lawyer to file Workers Compensation claim.

10  10. Plaintiff complained of unlawful actions by Defendants and/or engaged in protected activity

11  beginning on or around August/September 2018  by opposing racial discrimination, sex

12  discrimination, retaliation, disability discrimination, failure to interact, failure to accommodate,

13  exercising her rights under California's Workers Compensation law, requested FMLA leave which

14  Defendant/s interfered with and/or retaliated against, opposed of a racially and sexually hostile work

15  environment, opposed Delta's failure to promote based on race, and testified (writing a Declaration)

16  in another employee's Federal Title VII sex discrimination court case where Delta Air Lines, Inc. was

17  a Defendant , Plaintiff was notified by Delta Air Lines, Inc.'s lawyer and/or former Delta employee,

18  around September/ early October 2018 that Plaintiff was going to be summoned and/or subpoenaed

    to give testimony in another employee's workers compensation case where Defendant Delta was a

    Defendant.

19  11. Beginning around October 2018,  less than 8 weeks and/or just a few weeks after Plaintiff initially

20  engaged in each and/or all of the previously mentioned protected activity (which began around

21  August 2018 though October/November 2018),  Defendant Delta and/or Defendants began retaliating

22  against Plaintiff by revoking material benefits (travel benefits, shift swapping benefits ) causing

23  Plaintiff economic harm, intentionally preventing Plaintiff from earning income by maliciously

    ~~creating economic barriers by revoking her shift swapping benefits as an adverse employment actions~~

24  ~~for engaging in recent protected activity, refusing and failing to engage in the interactive process,~~

25  denial of all CFRA/ FMLA rights in violation of DFEH/FEHA/California State employment laws and

26  Federal Labor Laws, interference and/or revocation and/or termination of certain material benefits in

    Plaintiff's employment contract in violation of 1981. In or around April 2019, Plaintiff again opposed

27 *sex* racial discrimination and disability discrimination (failure to interact and failure to accommodate),

28  which was a **continual violation** of the previous racial, *sex* and disability discrimination. *Def. Delta then*
    *retaliated by suspending Plaintiff without pay for 2 weeks.*

*THIRD* **AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

1    12. Plaintiff also engaged in protected activity in several other class action lawsuits before, during

2    and after the year 2018, due to Defendant Delta's continual, intentional violations of California's

3    wage and hour/overtime laws. Plaintiff's involvement in these ongoing Class Action lawsuits, during

     2018, was also one of the many protected activities that Plaintiff engaged in at this time.

4

5    13. In September 2018, Plaintiff told Defendant Delta Air Lines, Inc. and Delta's TPA "third party

     administrator" Sedgwick CMS, that Plaintiff had a disability and/or mobility impairment that

6    required a reasonable accommodation.

7    14. In September 2018, Plaintiff requested FMLA leave _September 2019_, which Delta interfered

8    with. In October 2019, Plaintiff requested FMLA leave                which Delta interfered again

9    with.  _March 2020_

10       TOLLING DUE TO DISCOVERY OF CAUSE OF ACTION

11

12   15. "Vital information"or their "cause of action" is tolled until the earliest"accrual is delayed until the

     plaintiff has discovered his cause of action[.]" Gabelli v. SEC,           , 1221 (2013)& "vital

13   information" pertaining to "the existence of"claim that she tried, but failed, to obtain during the

     limitations period. Toussie v. United States, 397 U.S. 112, 115 (1970)Under federal law, a claim

14   accrues when a plaintiff knows or has reason to know of the injury that is the basis of the action and

15   the cause of that injury. See Bonneau v. Centennial Sch. Dist. No. 28J, 666 F.3d 577, 581 (9th Cir.

     2012); TwoRivers v. Lewis, 174 F.3d 987, 991 (9th Cir. 1999). Here, Gregg may be able to allege she

16   was unaware of her injuries until sometime after she stopped participating in the therapy sessions.

17   See Simmons v. United States, 805 F.2d 1363 (9th Cir. 1986). .Gregg v. Hawaii, Department of

     Public Safety, 870 F.3d 883, 887 ( 9th Cir 2017) Bibeau v. Pac. Nw. Research Found. Inc., 188 F.3d

18   1105, 1108 (9th Cir. 1999) (as amended) ("[T]he discovery rule has been observed as a matter of

19   federal law."). E.g.,Anderson v. Reno, 190 F.3d 930, 936 (9th Cir. 1999) (finding the continuing

     violations doctrine applicable to a hostile work environment claim, provided that the plaintiff

20   established "related discriminatory acts").

21       **FACTS COMMON TO ALL CAUSES OF ACTION:**

     **16.** Plaintiff began her employment with Delta on  09/26/2005.

22   17. From 2011 through around 2019/2020, Ms. Lee, or Plaintiff, was a Plaintiff or Delta employee

     involved in around 3 Class Action lawsuits that other Delta employees or former Delta employees

23   filed against Delta for Delta failure to follow California labor laws, specifically overtime and/or meal

24   and rest break and/or wage and hour laws.

     18. Because Delta failed to follow California labor laws and failed to properly document and/or pay

25   the correct amount of hours that the Class Members actually worked, Plaintiff and the other class

26   members received settlement checks as a result of Delta's intentional, continual violations of

     California's various wage and hour laws. As I am not an attorney, I cant explain them but Delta is

27   aware of these various class action lawsuits that I was a part of. One of them was for not paying

28   Plaintiff overtime when she worked over 8 hours a day in violation of California State labor laws.

     _THIRD_ **AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

19. While Delta has a time clock, it is generally used solely for the purposes of making sure that employees arrive to work on time and leaving at certain times, Delta generally does not use the time clock to document or record hours worked. As the time you swipe in and out on Delta's time clock is not the determinate hours Delta employees are paid.

20. A Delta manager from Nevada testified in a Federal court case that Delta does not use a time clock for payroll purposes.

21. **The proximity in time between Plaintiff's September 2018 requests to Delta for both a reasonable accommodation and request for intermittent FMLA leave, testifying in a former employees Title VII case and/or engaging with a lawyer to file a Workers Compensation claim, and from being on a medical leave and/or informing Delta that Plaintiff has a disability in September 2018, all and/or independently support** a causal connection between Plaintiff's protected activities and the subsequent October 2018 revocation of material benefits, (travel benefits, shift-swapping privileges, and denying Plaintiff right to participate in Delta's Dept. 125 seniority bidding process where Plaintiff was the employee who had the #1 seniority, meaning Plaintiff had first choice in the shift bidding process), which caused Plaintiff to sustain economic harm, that she would not have sustained had Plaintiff not engaged in this protected activity.

22. The proximity in time between when Plaintiff engaged in various forms of protected activity around September/October 2018, such as testifying and/or agreeing to testify as a witness in another employee lawsuit against Delta in both a workers compensation case and a Federal sex discrimination case, support a causal connection between Plaintiff's protected activities and the subsequent October 2018 revocation of material benefits, (travel benefits, shift-swapping privileges, and denying Plaintiff right to participate in Delta's Dept. 125 seniority schedule bidding process where Plaintiff was the employee who had the #1 seniority, meaning Plaintiff had first choice in the shift bidding process), which caused Plaintiff to sustain immediate economic harm, that she would not have sustained had Plaintiff not engaged in this protected activity.

23. **Prior to Plaintiff having engaged in protected activities in or around August 2018/ September 2018/October 2018,** Delta had never instantly revoked Plaintiff's material benefits (travel benefits and/or shift-swapping privileges, and/or denying Plaintiff right to participate in Delta's Dept. 125 seniority schedule bidding process) without any valid explanation and/or prior notice that Plaintiff violated any Delta company policy.

24. Prior to Plaintiff having engaged in the protected activity in or around August 2018/September 2018 where Plaintiff advised Delta that she was engaging with workers compensation lawyers to file a workers compensation claim, Delta had never instantly revoked Plaintiff's material benefits (travel benefits and/or shift-swapping privileges, and/or denying Plaintiff right to participate in Delta's Dept. 125 seniority schedule bidding process) without any valid explanation and/or prior notice that Plaintiff violated any Delta company policy.

25. **The proximity in time between when Plaintiff engaged with a lawyer to file a workers compensation claim against Delta around August 2018, support a causal connection between Plaintiff's protected activity and the subsequent October 2018 revocation of various material benefits,** (travel benefits, shift-swapping privileges, and denying Plaintiff right to participate in Delta's Dept. 125 seniority schedule bidding process where Plaintiff was the employee who had the #1 seniority, meaning Plaintiff had first choice in the shift bidding process), **which caused Plaintiff to sustain immediate economic harm, that she would not have sustained had Plaintiff not engaged in this protected activity.**

THIRD **AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

**26.** Prior to Plaintiff having engaged in the protected activity in September 2018 where Plaintiff requested both a reasonable accommodation and request for FMLA leave support to Delta, Delta had never instantly revoked Plaintiff's material benefits (travel benefits and/or shift-swapping privileges, and/or denying Plaintiff right to participate in Delta's Dept. 125 seniority schedule bidding process) without any valid explanation and/or prior notice that Plaintiff violated any Delta company policy.

27. Plaintiff engaged in various forms of protected activity around August 2018-October 2018 and/or from October 2018 through September 2019 and/or from September 2019 through June 2020.

28. Less than several weeks after Plaintiff engaged in various forms of protected activity around August 2018-October 2018, Plaintiff's material benefits, such as travel benefits and/or shift-swapping privileges, and/or Plaintiff right to participate in Delta's Dept. 125 seniority schedule bidding process, were all revoked.

29. Because Delta revoked Plaintiff's material benefits, such as travel benefits and/or shift-swapping privileges, and/or Plaintiff right to participate in Delta's seniority schedule bidding process, around September/October 2018, after Plaintiff engaged in various forms of protected activity, Plaintiff suffered immediate and future economic harm and emotional damages.

30. Delta was aware in or around September 2018/October 2018 that Plaintiff was both disabled, with a mobility impairment, and displaced from her home in Los Angeles, CA, and did not have a place to live and Plaintiff was looking for a place to live but needed adequate pay stubs(above $300.00 a week) to prove to a future landlord and/or roommate, and/or or rental agency that Plaintiff had a stable weekly income to afford renting a room and/or apartment.

31.  Because Delta revoked Plaintiff's material benefits, specifically shift-swapping privileges, and/or Plaintiff right to participate in Delta's seniority schedule bidding process, around September/October 2018 after Plaintiff engaged in various forms of protected activity, Plaintiff suffered immediate and future economic harm,  which as a result caused Plaintiff  to continue to be without a place to live and/or displaced and/or homeless, while being disabled and/or having a disability.

32. Because Delta was aware in or around September 2018/October 2018 that Plaintiff was both disabled, with a mobility impairment, and homeless (displaced from her home in Los Angeles, CA), Delta maliciously retaliated against Plaintiff for engaging in protected activity by preventing Plaintiff from earning income by revoking her shift swapping privileges and/or Plaintiff's right to participate in Delta's Dept. 125 seniority schedule bidding process, when Delta knew that Plaintiff needed to pick up shifts (hours) by shift swapping and/or have her first choice in the bidding process, where either and/or both would've allowed Plaintiff to no longer be homeless.

**33.** Delta intentionally and maliciously discouraged Plaintiff from engaging in protected activity and/ or **further future protected activities** in or around September 2018/October 2018 , when Delta intentionally and maliciously prevented Plaintiff from earning income to keep Plaintiff homeless, while disabled, by revoking her shift swapping privileges and/or Plaintiff's right to participate in Delta's Dept. 125 seniority schedule bidding process **after Plaintiff initially** engaged in various forms of protected activities in or around August/ September/October 2018.

34. Plaintiff initially engaged in these various forms of protected activity around August/September/ October 2018.

35. After Plaintiff initially engaged in these various forms of protected activity beginning around August/September/October 2018, Delta and/or its managing agents and/or Defendants, began retaliating against Plaintiff around late September 2018, immediately after Plaintiff engaged in these various forms of protected activity mentioned within this complaint. ─────────────

36. After Plaintiff was initially retaliated against by Delta in September 2018 for engaging in protected activity when Delta revoking her pass travel benefits, which left Plaintiff stranded while she was connecting in Atlanta, GA from an overnight international flight Plaintiff suffered immediate economic harm as a result of engaging in protected activity (request for reasonable accommodation and/or request to take FMLA leave) as Plaintiff was forced to borrow $200.00 from a friend to be able to pay for a hotel room, so Plaintiff did not have to sleep outside in a dangerous park near the Atlanta airport, where Plaintiff could've been physically and/or sexually assaulted and/or robbed of the few possessions that she owned.

37. But for Delta's retaliatory act around September 2018 against Plaintiff for engaging in protected activity by revoking her pass travel benefits, Plaintiff would NEVER have suffered the immediate economic loss of $200.00, which further prevented Plaintiff from finding a place to live in Los Angeles, CA , as Delta forced Plaintiff into further .. financial debt, as Plaintiff then      owed a friend $200.00, which she didn't have at the moment,

38. In or around  September 2018,  Delta retaliated against Plaintiff, for engaging in protected activity at least 3 months prior, when Delta revoked Plaintiff's pass travel benefits, which left Plaintiff stranded while she was connecting in Atlanta, GA from an overnight international flight.
                                        .As a result of Defendant Delta's retaliation, Plaintiff suffered immediate economic harm as a result of engaging in protected activity (request for reasonable accommodation and/or request to take FMLA leave, engaging with attorney to file workers compensation claim, and testifying in another employees Title VII case), as Plaintiff was forced to borrow $200.00 from a friend to be able to pay for a hotel room, so Plaintiff did not have to sleep outside in a dangerous park near the Atlanta airport, where Plaintiff could've been physically and/or sexually assaulted and/or robbed of the few possessions that she owned. Because of Def. Delta's retaliation, Plaintiff suffered immediate economic damage in the amount of $200.00. (FMLA Loss clai

39.Because Plaintiff requested to take FMLA leave in September 2018 , Delta and/or its managing agents viewed it as a **negative factor** by making a subsequent decision around late September/ October 2018 to revoke Plaintiff's material benefits, such as travel benefits and/or shift swapping benefits, and/or seniority shift scheduling bidding benefits, and/or that Plaintiff was not allowed to ask for any future days off and/or refusing and/or failing to interact with Plaintiff when Plaintiff requested several of the same and/or identical reasonable accommodations in September 2018- April 2019 and again in February 2021,

40. Because Plaintiff requested a reasonable accommodation and/or FMLA leave in around mid to late September 2018,  Delta Air Lines, Inc and/or its managing agents, including but not limited to Defendants Rangel and Turnpap, retaliated against Plaintiff by revoking her material benefits, her Delta pass travel benefits, whereby Defendants left Plaintiff stranded overnight in Atlanta, GA, after an international flight,                                     in or around late September 2018, causing Plaintiff immediate economic damage in the amount of $200.00.

41. Def. Delta Air Lines, Inc. and/or Def. Ashley Rangel used Plaintiff's request for a need to apply for intermittent FMLA leave in mid to late September 2018 as a negative factor in its' decision to subsequently refuse to interact with Plaintiff, when Plaintiff made several requests for various reasonable accommodations, beginning in late September 2018 through early December 2019.

42. Def. Delta Air Lines, Inc. and/or Def. Ashley Rangel was aware that Plaintiff made at least one, if not several, written requests via email for a reasonable accommodation in October 2018 and/or November 2018.

THIRD AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)

43. Plaintiff was eligible for the CFRA/FMLA's protections *in 2018 and/or 2019.*

44. Def. Delta Air Lines, Inc. is/was covered by the CFRA/FMLA, *at all times.*

45. Plaintiff was entitled to intermittent leave under the CFRA/FMLA *in 2018 and/or 2019.*

46. Plaintiff provided sufficient notice to Delta and/or its third party administrator, Sedgwick CMS, of her intent to take leave *in* late September/October 2018, *under CFRA/FMLA.*

47. In 2018, Def. Delta Air Lines denied Plaintiff FMLA benefits to which she was entitled to by telling her she wasn't allowed to ask for any days off in October 2018.

48. Around October 2018, Plaintiff opposed Def. Delta's FMLA violations by sending emails and making phone calls to Delta's Equal Opportunity office reporting that Defs. Rangel and/or Turnpap had told her that she was prohibited from taking ANY days off and/or that Plaintiff was not allowed to apply for intermittent FMLA for days off for her qualifying FMLA medical condition, *migraines.*

49. Prior to October 2018, Plaintiff was out of work on a medical leave and/or disability leave, as a result of an on the job injury.

50. Generally, when Def. Delta Air Lines employee go out on workers compensation leaves, Sedgwick CMS, the TPA, processes the first 12 weeks of the Delta employees' workers compensation leaves under the FMLA.

51. Upon information and belief, Sedgwick CMS processed the first 12 weeks of Plaintiff's "OJI" leave and/or workers compensation leave under the FMLA and/or Sedgwick CMS processed the first 12 weeks of Plaintiff's "OJI" leave and/or workers compensation leave as an approved, qualifying FMLA leave.

52. Upon information and belief, Sedgwick CMS did not process the first 12 weeks of Plaintiff's "OJI" leave and/or workers compensation leave under the FMLA and/or Sedgwick CMS did not process the first 12 weeks of Plaintiff's "OJI" leave and/or workers compensation leave as an approved, qualifying FMLA leave.

53. Under the FEHA, a transfer is considered a Reasonable Accommodation, *as it is under SB 400.*

54. In late 2018, Def. Delta failed to accommodate Plaintiff's reasonable accommodation request for a transfer to another Delta airport location, *in violation of the FEHA and/or SB400.*

55. Had Def. Delta and/or its managing agents properly and/or actually engaged in the interactive process when Plaintiff made a reasonable accommodation request for a transfer, Plaintiff would have been and/or should have been granted her reasonable Accommodation of a transfer, as Def. Delta had job vacancies for the same job position in NYC in which Plaintiff requested a transfer to, as a reasonable accommodation.

56. Def. Delta would not have suffered any hardship by transferring Plaintiff to its NYC airport location, as Def. Delta had job vacancies for Plaintiff's position in at least one NYC airport for the same job title and/or comparable job position which Plaintiff had in or around October 2018, while she was working for Delta Air Lines, Inc. at Los Angeles "LAX" International Airport, *in Dept 125.*

57. Def. Delta never informed Plaintiff that Delta would have suffered a hardship if Delta granted Plaintiff's reasonable accommodation request for a transfer. *In 2018 and/or 2019 and/or February 2021.*

58. Joanne Guerrant is/was a Delta Air Lines, Inc employee who works in Delta's Equal Opportunity Department,

59. Joanne Guerrant, who works in Delta's Equal Opportunity Department, testified in Lewis v. Delta, that the local HR Manager was/is responsible for initiating the interactive process.

THIRD **AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

Case 2:20-cv-08754-CBM-JEM  Document 28  Filed 03/08/21  Page 12 of 67  Page ID #:537

60. In or around October 2018, Def. Ashley Rangel was/is Delta's local HR Manager, who was responsible for engaging in the interactive process when Plaintiff made various verbal and/or written requests for a reasonable accommodation/s.

61. At no point in 2018, while Plaintiff was working for Delta at Los Angeles "LAX" International Airport, did Sedgwick and/or Def. Delta inform Plaintiff that she did not qualify for a FMLA leave and/or inform Plaintiff in writing that she was ineligible for an intermittent FMLA leave.

62. Around October 2018, Def. Rangel, as a Delta HR Manager, told Plaintiff that Plaintiff was prohibited from requesting any days off while Plaintiff was a Delta employee, working for Delta at Los Angeles "LAX" International Airport in October 2018.

63. In or around October 2018, when Def. Rangel, as a Delta HR Manager and/or on behalf of Def. Delta Air Lines, Inc, told Plaintiff that Plaintiff was prohibited from requesting any days off while Plaintiff was a Delta employee, working for Delta at Los Angeles "LAX" International Airport, Def. Rangel failed to cite any Delta Air Lines company policy and/or any state, federal, or Los Angeles county law that clearly shows that an employee and/or Plaintiff is/was prohibited form asking for days off.

64. Around October 2018, Def. Rangel, as a Delta HR Manager, violated the FEHA, CFRA/FMLA, and California labor laws, when Def. Rangel told Plaintiff that Plaintiff was prohibited from requesting any days off while Plaintiff was a Delta employee, working for Delta at Los Angeles "LAX" International Airport in October 2018.

65. There is an inference of retaliation and/or interference with CFRA/FMLA by Def. Delta Air Lines, Inc., as neither Def. Rangel and/or Def. Turnpap were ever able to show Plaintiff in writing, with specific     citations, which Delta company policy and/or which state, federal, or Los Angeles county law clearly prevented and/or prohibited  Plaintiff  from asking for days off and/or from requesting to take intermittent FMLA leave.

66. In October 2018, Defendant Delta and/or its managing agents disparately discriminated and/or retaliated against Plaintiff, because of her race and/or sex and/or for engaging in previous protected activity less than 3 months prior to October 2018, by explicitly prohibiting Plaintiff from taking and/or requesting days off for a serious qualifying medical condition under the FMLA.

67. Upon information and belief, if Delta Air Lines, Inc.  processed the first 12 weeks of Plaintiff's "OJI" leave and/or workers compensation leave in 2018 as an approved FMLA leave, then Def. Delta interfered with and/or retaliated against Plaintiff for taking FMLA leave, as Plaintiff was not reinstated to the same position with all the same material benefits, as Plaintiff previously had BEFORE she took the FMLA leave.

68. After Plaintiff requested to take an FMLA leave in September 2018 to Delta's TPA, Sedgwick CMS, Def. Delta interfered with Plaintiff's FMLA rights and/or retaliated against Plaintiff by revoking Plaintiff's material benefits, by revoking Plaintiff's pass travel benefits, seniority shift bid benefits, shift swapping and then by Defendants subsequently prohibiting Plaintiff from either requesting and/or taking  any day off and/or Defendants subsequently interfering with Plaintiff's exercise of her FMLA rights by explicit denying Plaintiff the right to even fill out paperwork to have her intermittent FMLA leave approved by Delta's third party administrator, Sedgwick CMS.

69. Def. Delta's failure to interact and its ' failure to accommodate Plaintiff's reasonable accommodation requests are 2 independent causes of action. See Swanson v. Morongo Unified Sch. Dist., 181 Cal. Rptr.3d 553, 567 (Ct. App. 2014) ─────────────

**AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

70. In 2018, Def. Delta failed to interact with Plaintiff after Plaintiff made several verbal and/or written requests for a Reasonable Accommodation, while Plaintiff was working for Delta Air Lines, at Los Angeles "LAX" International Airport.

71. In or around ***April 2019,*** Def. Delta retroactively denied all of Plaintiff's ***2018 reasonable accommodation requests that*** Plaintiff made while Plaintiff was employed at Delta's Los Angeles "LAX" Airport back in 2018, without any explanation and/or without ever engaging in the interactive process with Plaintiff at any time before Delta refused and/or failed to accommodate Plaintiff.

72. In or around April 2019, Plaintiff made   other ***reasonable accommodation requests that Delta subsequently also denied in 2019,*** without any explanation and/or without ever engaging in the interactive process with Plaintiff at any time before Delta refused and/or failed to accommodate Plaintiff's April 2019 requests for a reasonable accommodation.

73. Def. Delta's April 2019 failure to interact and failure to reasonable accommodate Plaintiff's 2019 request for a reasonable accommodation was a continuing violation, as Def. Delta had still failed to interact and failed to accommodate Plaintiff's 2018 reasonable accommodation requests.

74. In April 2019, because of Plaintiff's disability and/or mobility impairment, Plaintiff was unable to walk up stairs.

75. In April 2019, because Plaintiff's disability and/or mobility impairment prevented Plaintiff from being able to walk up stairs, Plaintiff sent an email request to Delta's Equal Opportunity Department asking for a reasonable accommodation, which was simply that Plaintiff be allowed to leave work exactly at the time her that her shift ended. Because of Plaintiff's disability and/or mobility impairment, Plaintiff needed to leave work at      exactly    the time her shift ended, so Plaintiff could secure a scheduled ride home with a para-transit ride sharing service for disabled people. Without this reasonable accommodation of allowing Plaintiff to leave work at the exact time her shift ended, Plaintiff was unable to   schedule daily rides home with a para-transit ride sharing service for disabled people, forcing Plaintiff to take public transportation, which Plaintiff was unable to do, because of her disability, as the metro station was inaccessible for disabled people with mobility impairments, as the metro station did not have any elevators, forcing Plaintiff to walk up several flights of stairs, which her disability/mobility impairment prevented her from doing.

76. After or around Plaintiff made this April 2019 reasonable accommodation request based on Plaintiff's disability, Def. Delta failed to state and/or explain to Plaintiff how allowing Plaintiff to leave work at the exact time her shift ended was an extreme hardship to Delta Air Lines, Inc. As a result , Def. Delta again, in 2019, failed to interact and /or accommodate Plaintiff's reasonable accommodation request where Plaintiff simply asked to leave work at the time her shift ended so that Plaintiff can be able to secure a planned ride with a para-transit ride sharing service for disabled people.

77. From around September 2018- mid 2019, a reasonable accommodation and/or reasonable accommodations would have been possible at all times when Plaintiff made her reasonable accommodation requests to Def. Delta and/or its managing agents.

78. As a result of Def. Delta's failure to interact and failure to reasonably accommodation, Plaintiff suffered immediate and/or long term economic harm as she had to pay for private car services, which she would not have suffered BUT FOR Delta's discrimination based on Plaintiff's disability, and/or Delta's failure to interact and/or its' failure to accommodate Plaintiff's reasonable accommodation requests.

THIRD **AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

79. In 2018 and/or 2019, Delta's Equal Opportunity Department failed to interact with Plaintiff after Plaintiff made several verbal and/or written requests for a Reasonable Accommodation, while Plaintiff was working for Delta Air Lines, at Los Angeles "LAX" International Airport in 2018.

80. As evidenced by Exhibits 1 and/or 2, on or before October 2018, Def. Delta Air Lines, Inc. was aware that Plaintiff was displaced from her Los Angeles residence.

81. As evidenced by Exhibits 1 and/or 2, on or before October 2018, Def. Delta Air Lines, Inc. was aware that because Plaintiff was displaced from her Los Angeles residence, Plaintiff did not have a stable place to live in 2018 while she working for Delta Air Lines, Inc. at Los Angeles "LAX" International airport, and/or that Plaintiff was looking for a stable place to live in 2018 while she working for Delta Air Lines, Inc. at Los Angeles "LAX" International airport. Because Plaintiff was displaced in 2018 and then Plaintiff was subsequently out on a medical leave, Plaintiff had a few and/or no adequate pay stubs and/or a place to live, Plaintiff made a verbal and/or written reasonable accommodation request for a hardship transfer to another airport in which Def. Delta Air Lines, Inc. operates, for Plaintiff to escape her situation of being homeless and/or disabled in Los Angeles, CA.

82. Delta Air Lines and/or its managing agents intentionally and maliciously attempted to cause Plaintiff more severe emotional distress by refusing and/or failing to interact and/or refusing to accommodate Plaintiff's reasonable accommodation request, as Delta was aware that Plaintiff did not have a place to live and Plaintiff was looking for a place to live but needed adequate pay stubs, above an approximate $300.00 a month, to prove to a potential future landlord and/or potential roommate, and/or potential rental agency that Plaintiff had a stable weekly income of around $300.00 a week, to prove she could afford renting a room and/or apartment, allowing Plaintiff to no longer be displaced and/or homeless during her employment with Delta Air Lines, Inc in 2018.

83. Based on temporal proximity, there is a causal connection between Plaintiff's protected activities and the subsequent October 2018 revocation of material benefits, (travel benefits, shift-swapping privileges, and denying Plaintiff right to participate in Delta's Dept. 125 seniority bidding process where Plaintiff was the employee who had the #1 seniority, meaning Plaintiff had first choice in the shift bidding process), which caused Plaintiff to sustain economic harm, that she would not have sustained had Plaintiff not engaged in this protected activity.

84. Plaintiff sustained economic harm, as a result of Delta's retaliatory acts based on Plaintiff's exercise of her rights under the FMLA, FEHA, Title VII, ADA and 1981, *CFRA & SB 400.*

85. In September 2018, Plaintiff was not sure how many hours she worked within the last 12 months, as she was never told by Sedgwick and/or Delta and/or Def. Ashley Rangel that she did not meet the minimum required hours under the FMLA guidelines.

86. Delta Air Lines discouraged Plaintiff from exercising her rights under the FMLA and/or using and/or applying for intermittent FMLA leave again in October 2019.

87. Sedgwick CMS is Delta's "TPA," or third party administrator, which handles Delta's workers compensation claims, authorizes medical treatment for workplace injuries that Delta employees sustain on the job ("OJI" meaning on the job injuries), manages and approves FMLA for Delta employees, and Delta directs its' employees to first contact Sedgwick when coming back to work from any type of disability leave and/or OJI leave (workers compensation leave) and/or FMLA leave.

88. Before 2018, Plaintiff had always been previously approved for FMLA and/or a "medical leave," where Plaintiff was never retaliated against by Delta and/or its managing agents with the revocation of material benefits, as Delta and/or its managing agents retaliated against Plaintiff in 2018 after she

1  returned from a "medial leave" and/or requested to take intermittent FMLA leave and/or days off in October 2018 for a qualifying serious medical conditions under the FMLA, *migraines,*

2  89.In September 2018, Plaintiff made a Reasonable Accommodation Request to Delta Air Lines, by first emailing Sedgwick, then calling Sedgwick to request intermittent FMLA leave upon Plaintiff's return to work in October 2018.

3  90. Around 2013-2014, Plaintiff was approved for FMLA when working at Delta's SkyClub at Los Angeles "LAX" airport.

4  91. Because of Plaintiff's sex (female), Def. Delta and/or its managing agents, including but not limited to Def. Rangel and/or Def. Turnpap, individually and/or collectively, disparately discriminated against Plaintiff in or around October 2018, by their revocation of Plaintiff's material benefits, such as shift swapping benefits and/or seniority based shift bidding benefits, upon Plaintiff's return from her approved disability leave, which caused Plaintiff, a female, to sustain economic harm, where as similarly situated male Delta employee/s, such as George McCullough, because of his sex, never sustained any and/or the same economic harm as Plaintiff, a female, sustained, when he, George McCullough, returned from a similarly approved disability leave, as Delta and its' managing agents, never revoked George McCullough's identical material benefits, such as shift swapping benefits and/or seniority based shift bidding benefits, as they did to Plaintiff, a female.

92._Around a few months before Plaintiff was discriminated against because of her sex_ (female), **ANOTHER** similarly situated **FEMALE** employee named **Georji**, who was employed by Def. Delta for around 40 years, was also disparately discriminated against, in the same identical manner as Plaintiff was when Delta and/or its managing agents revoked Georji's, identical material benefits, such as shift swapping benefits and/or seniority based shift bidding benefits, as Delta and/or its managing agents did to Plaintiff, who is also a female, when they both returned from an approved disability leave *and/or FMLA leave/CFRA leaves*

**93. Delta employee, Georji,** because of her sex, had told Plaintiff that she was also aware of similarly situated male employees, such as George McCullough, who because of his sex, never sustained any and/or the same economic harm as Plaintiff and Georji, two females, sustained, when he, George McCullough, returned from a similarly approved disability leave, as Delta and its' managing agents, never revoked George McCullough's identical material benefits, such as shift swapping benefits and/or seniority based shift bidding benefits, as they did to females, who had a disability and went out on a disability leave/s. *and/or FMLA/CFRA leaves.*

**94.**Around October 2018, Plaintiff wrote an email to Delta's Equal Opportunity Department, where Plaintiff clearly opposed Delta's Los Angeles "LAX" Airport managers, Defendants Ashley Rangel and/or Joseph Turnpap, arbitrary and/or discretionary disparate sex discrimination that they had subjected Plaintiff to, because of her sex, that similarly situated male employees, such as George McCullough, were never subjected to because of his sex.

**95.**After Plaintiff sent this email to Delta's Equal Opportunity Department around October 2018, opposing the sex based disparate discrimination that Defendants Ashley Rangel and/or Joseph Turnpap had subjected Plaintiff to, because of her sex, that similarly situated male employees, such as George McCullough, were never subjected to because of his sex, Delta's Equal Opportunity Department subsequent response to Plaintiff's email basically stated that Defendants Ashley Rangel and/or Joseph Turnpap abused their discretion by arbitrarily imposing some non-existent Delta policy

 **AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

1   at Delta's Los Angeles LAX Airport, which disparately impacted and/or disparately discriminated
    against Plaintiff, because of her sex.

2   96. Defendant Delta has confirmed to Plaintiff that Plaintiff was both disparately impacted and/or

3   disparately discriminated, because of her sex, in October 2018, when Plaintiff sustained economic
    harm as a result of Defendants Ashley Rangel and/or Joseph Turnpap, arbitrarily revocation of

4   Plaintiff's shift swapping benefits and/or seniority based shift bidding benefits, upon Plaintiff's return

5   from an approved disability leave *and/or FMLA/CFRA leave*.

    97. After Defendant Delta confirmed to Plaintiff in email that Plaintiff was basically both disparately

6   impacted and/or disparately discriminated, because of her sex, in October 2018, when Plaintiff

7   sustained economic harm as a result of Defendants Ashley Rangel and/or Joseph Turnpap, arbitrary
    revocation of Plaintiff's shift swapping benefits and/or seniority based shift bidding benefits, upon

8   Plaintiff's return from an approved disability leave, Def. Delta's Equal Opportunity Department, in

9   October 2018, clearly stated that the arbitrary and discriminatory local Delta policy that Defendants
    Ashley Rangel and/or Joseph Turnpap's unilaterally applied to Plaintiff, because of her sex, would no

10  longer allowed to be applied at Los Angeles "LAX" airport.

11  98. Defendant Delta does not deny that its' Los Angeles "LAX" airport managing agents, Defendants
    Ashley Rangel and/or Joseph Turnpap, arbitrarily and/or unilaterally decided to apply an unwritten

12  Delta policy to Plaintiff, because of her sex and/or race, that was NOT applied universally to all
    similarly situated Delta employees*.*

13  99. According to Delta's Equal Opportunity Department, after around October/ November 2018, Los

14  Angeles "LAX" managing agents, specifically Defendants Ashley Rangel and/or Joseph Turnpap,
    were prohibited from continuing to discretionarily apply their illegal, discriminatory, and arbitrary

15  policy of revoking the shift swapping benefits and/or seniority based shift bidding benefits of

16  similarly situated female Delta employees, upon their return from an approved disability *i FMLA leave*.

    100. Although Defendant Delta had confirmed to Plaintiff that Plaintiff was both disparately impacted

17  and/or disparately discriminated, because of her sex, in October 2018, when Defendants Ashley

18  Rangel and/or Joseph Turnpap, arbitrarily revoked Plaintiff's shift swapping benefits and/or seniority
    based shift bidding benefits, upon Plaintiff's return from an approved disability leave, Defendant

19  Delta has refused to compensate Plaintiff with back pay, for the loss of wages/ income that Plaintiff

20  sustained as a result of the economic harm that Defendants Ashley Rangel and/or Joseph Turnpap
    intentionally and illegal inflicted upon Plaintiff, because of her sex *& for exercising rights under FMLA*.

21  101. Defendant Delta, at all times, aided and abetted Defendants Ashley Rangel and/or Joseph

22  Turnpap's illegal discriminating against Plaintiff, because of her sex, by allowing Defendants Ashley
    Rangel and/or Joseph Turnpap to use their discretion in creating and applying arbitrary rules and

23  ~~policies where they revoked the shift swapping benefits and/or seniority based shift bidding benefits~~
    ~~of similarly situated female Delta employees, upon their return from an approved disability leave,~~

24  which disparately impacted and disparately targeted females, such as Plaintiff, because of their sex,
    *and/or RACE* causing Plaintiff economic harm.

    102. But for Defendants Ashley Rangel and/or Joseph Turnpap's illegal and discriminatory, arbitrary

26  policy whereby these Defendants revoked Plaintiff's shift swapping benefits and/or seniority based

27  shift bidding benefits , because of her sex and/or race, upon Plaintiff's return from an approved
    *FMLA/* disability leave, Plaintiff would have picked up other employees shifts totaling at least and/or around

28  200 hours, if not more.

*THIRD* **AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

*FMLA leave?*

1  103.But for Defendants Ashley Rangel and/or Joseph Turnpap's illegal and discriminatory, arbitrary

2  policy whereby these Defendants revoked Plaintiff's shift swapping benefits and/or seniority based
   shift bidding benefits, because of her sex, upon Plaintiff's return from an approved disability leave/

3  Plaintiff would have picked up other employees shifts totaling an approximate 200 hours, whereby
   Plaintiff would have conservatively earned at least $5,400.00, as Plaintiff earned approximately

4  $27.00 an hour. *Plaintiff is entitled to her loss wages under 2617 of the FMLA.*

5  104. **Because of** Defendants Ashley Rangel and/or Joseph Turnpap's illegal and discriminatory,

6  arbitrary disparate policy whereby these Defendants revoked Plaintiff's shift swapping benefits and/
   or seniority based shift bidding benefits, because of her race and/or sex, upon Plaintiff's return from

7  an approved disability leave, Plaintiff suffered economic loss of a least $5,400.00, without interest, as
   Plaintiff would have earned approximately $27.00 an hour x 200 hours.

8  105.Because of Defendants Ashley Rangel and/or Joseph Turnpap's illegal and discriminatory,

9  arbitrary policy whereby these Defendants revoked Plaintiff's shift swapping benefits and/or seniority
   based shift bidding benefits, **because of her sex and/or race,** upon Plaintiff's return from an

10 approved disability leave, Plaintiff suffered economic loss of a least $5,400.00, without interest,

11 which would have lifted her out of homelessness and/or given her pay stubs to have found at least a
   room and/or a studio apartment in the Los Angeles area, as no reasonable person, who is also

12 disabled, would voluntarily choose to be homeless, while disabled, when they are gainfully employed
   and working for a major U.S. corporation.

13 Beginning in October 2018, Defendant Delta has refused to compensate Plaintiff with back pay, for

14 the loss of wages/ income that Plaintiff sustained as a result of the economic harm that Defendants
   Ashley Rangel and/or Joseph Turnpap intentionally and illegal inflicted upon Plaintiff, because of her

15 *exercising her rights under FMLA.* (See *Farrell v. Tri County*, *No. 06-35484, (9th Cir, 2008)*)

16 106. Because Plaintiff had previously worked for Delta in the same department and/or in same

17 position, in other airports in both California and/or in other states, Plaintiff was aware that there was
   no written universal Delta company policy  that stated that Delta revokes the shift swapping benefits

18 and/or seniority based shift bidding benefits to similarly situated male and female Delta employees,
   upon their return from an approved disability leave *and/or FMLA leave,*

19 107. Because Plaintiff had previously worked for Delta in the same department and/or in same

20 position, in other airports in both California and/or in other states, Plaintiff was aware that not only
   there was never a written Delta company policy that stated that Delta revokes the shift swapping

21 benefits and/or seniority based shift bidding benefits to similarly situated male and female Delta

22 employees, upon their return from an approved disability leave, but Plaintiff was personally aware
   that Delta management and/or Delta HR in other airport stations never revoked Plaintiff's shift

23 ~~swapping benefits and/or seniority based shift bidding benefits when Plaintiff returned from her other~~
   ~~previous FMLA and/or disability leaves, while employed by Delta at other airport locations~~ *prior to 2018*

24 108.Because Plaintiff had previously worked for Delta in the same department and/or in same

25 position, in other airports in both California and/or in other states, Plaintiff was aware that not only
   there was never a written Delta company policy that stated that Delta revokes the shift swapping

26 benefits and/or seniority based shift bidding benefits to similarly situated male and female Delta

27 employees, upon their return from an approved disability leave, but Plaintiff, in October 2018,
   confirmed with other similarly situated Delta employees in other airport stations such as San Diego

28 Airport ("SAN") and/or Newark Airport ("EWR") and/or LaGuardia Airport ("LGA") and/or John F.
   Kennedy Airport ("JFK") and/or Atlanta Airport ("ATL") that Delta management and/or Delta HR

*THU(1)* **AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

did not have any local policy and/or local rule in these stations whereby these other stations unilaterally revoked the shift swapping benefits and/or seniority based shift bidding benefits of similarly situated male and female Delta employees, upon their return from an approved disability leave and/or FMLA leave in 2018.

109. Defendant Delta and/or its managing agents, including but not limited to Def. Rangel and/or Def. Turnpap, individually and/or collectively, disparately discriminated against Plaintiff in or around October 2018, by their revocation of Plaintiff's material benefits, such as shift swapping benefits and/or seniority based shift bidding benefits, upon Plaintiff's return from her approved disability leave, which caused Plaintiff, a female, to sustain economic harm, where as similarly situated male Delta employee/s, such as George McCullough, because of his sex, never sustained any and/or the same economic harm as Plaintiff, a female, sustained, when he, George McCullough ,returned from a similarly approved disability leave, as Delta and its' managing agents, never revoked George McCullough's identical material benefits, such as shift swapping benefits and/or seniority based shift bidding benefits, as they did to Plaintiff, a female, who is black.

110. Because of her sex, a similarity situated Def. Delta and/or Def. Rangel and/or Def. Turnpap, individually and/or collectively, disparately discriminated against Plaintiff in or around October 2018, by their revocation of Plaintiff's shift swapping privileges and/or seniority based shift bidding privileges upon returned from an approved disability leave, which caused Plaintiff, a female, to sustain economic harm, whereby similar situated male Delta employee/s, such as George McCullough, because of his sex, never sustained the same economic harm that Plaintiff did, when he returned from an approved disability leave, as his shift swapping benefits and/or seniority based shift bidding benefits were never revoked when he returned from an approved disability leave/FMLA leave.

111. As evidenced by Exhibit 1 attached to the complaint, Defendant Delta emailed Plaintiff telling her that Def. Delta and/or its managing agents treated George McCullough, a similarly situated male comparator, according to Delta company policy.

112. George McCullough, a male Delta Dept. 125 "LAX" employee, is and/or was similarly situated to Plaintiff, Erika Lee, a female, in all material aspects.

113. It is undisputed by Def. Delta and/or its managing agents that Plaintiff was treated differently than George McCullough, a similarly situated male comparator in all material aspects, when Plaintiff return from an approved medical leave and Def. Delta and/or its managing agents revoked Plaintiff's material benefits, causing her to sustain economic harm.

114. George McCullough, a similarly situated male comparator in all material aspects, did not have his material benefits, swapping benefits and/or shift-bidding benefits, revoked by Def. Delta and/or its managing agents when he, George McCullough, returned from an approved medical leave.

115. George McCullough, a similarly situated male comparator in all material aspects, did not sustain any economic harm ,as Plaintiff did, when he, George McCullough, returned from an approved medical leave, because George McCullough ,a male, was never prohibited by Defendants from picking up hours by shift swapping, swapping shifts with other similarly situated employees for purposes of gaining income and/or for purposes of scheduling flexibility, and/or swapping or dropping for personal reasons. Because of Plaintiff's disability, Plaintiff needed to be reasonably accommodated and/or be able to swap shifts and/or have a morning shift(that Angel Williams, with less seniority, was able to request/obtain) and/or be able to ask for days off to seek medical treatment for Plaintiff's disability. Under Delta's own company policy, other similarly situated employees, who had just returned from a medical leave were able to swap shifts and/or have a morning shift (Angel

THIRD **AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

Williams, even with less seniority than Plaintiff, *who* who returned to work AFTER Plaintiff, received the morning shift after Angel requested it) which was denied to Plaintiff, and/or Plaintiff needed to able to ask for days off to seek medical treatment for Plaintiff's disability. Because of Plaintiff's actual and/or perceived disability and/or because Plaintiff told Def. Delta that she had a disability in September 2018, Def. Delta discriminated against Plaintiff by refusing to engage in the interactive process and/or refusing to reasonably accommodate Plaintiff's disability, when non- disabled employees were all granted the same requests that Plaintiff requested in her reasonable accommodation requests, which proves that Plaintiff's reasonable accommodation requests were not a hardship to Def Delta, as Def. Delta freely granted other non-disabled similarly situated employees, like Angel Williams, George McCullough, Kimberly Ng, these reasonable requests, But after Plaintiff told Delta that she had a disability, Def. Delta refused to follow its own company policy and discriminated against Plaintiff because of her disability, and revoked Plaintiff's material benefits that Plaintiff was entitled to based on her Ready Reserve employment contract. Before Plaintiff told Def. Delta that she had an actual and/or perceived disability in September 2018, Def. Delta never previously revoked Plaintiff's material benefits.

116.As evidenced by Exhibits 1 and/or 2, Def. Ashley Rangel emailed Plaintiff and admitted,"In looking for **George's information, everything was in line with policy.**"

117.On October 31, 2018, Def. Rangel emailed Plaintiff and admitted, ***"You do have the ability to swap shifts, I confirmed with Admin that you are able to do so now. The disconnect I see was the ability to swap immediately after returning from leave,"*** however Plaintiff was never allowed to do so after *there*

118. Had Plaintiff not complained to Delta's Equal Opportunity Department in Atlanta, GA that Defendants Rangel and/or Turnpap were disparately discriminating against Plaintiff, because of her sex and/or race, Defendants Rangel and/or Turnpap would have continued discriminating against Plaintiff causing her further economic harm, by their indefinite revocation of her shift swapping benefits. However, even after Plaintiff opposed Defendants Rangel and/or Turnpap's disparate discrimination, because of her sex and/or race, Defendants Rangel and/or Turnpap continued discriminating against Plaintiff causing her further economic harm, by revoking Plaintiff seniority shift bidding benefits that all Delta employees are entitled to, whereby Defendants Rangel and/or Turnpap's also impaired, and/or modified and/or interfered with Plaintiff's Ready Reserve employment contract, because of her race, that they did not do to other similarly situated *white* employees.

119.As evidenced by Exhibits 1 and/or 2, Plaintiff opposed Defendants violations of CFRA, FMLA, FEHA, Title VII and California State Labor laws in regards to Defendants illegal threats to Plaintiff, where **Defendants told Plaintiff that she was prohibited from applying for intermittent FMLA/ CFRA leave and/or prohibited from using sick days and/or taking or requesting any days off.**

120.As evidenced by Exhibits 1 and/or 2, **Plaintiff, because of her sex,** was treated differently than similarly situated male employees, such as George McCullough, after Plaintiff returned from a "medical leave," *and/or CFRA/FMLA leave.*

121.As evidenced by Exhibits 1 and/or 2, it is undisputed by all parties, that in 2016, upon return to work from a "medical leave," Plaintiff was unable to immediately swap shifts and ask for days off, use her shift swapping benefits and/or seniority shift bidding benefits and/or apply for a transfer that other similarly situated active and/or inactive Delta employees, such as Angel Williams and/or George McCullough and/or Kimberly Ng, were able to do upon their return from a medical leave.

122.**Because it is undisputed by all parties, as evidenced by Exhibits 1 and/or 2, that Defendants, in 2016, did not revoke** Plaintiff's shift swapping privileges, seniority bid shift benefits, travel —

*THIRD* **AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

benefits, and/or ability to ask for days off (free exercise of Plaintiff's CFRA/FMLA rights), ***there is an inference of discrimination and/or retaliation in October 2018,*** based on **protected activities** that Plaintiff engaged in less than **a few months before October 2018**, as Plaintiff's material benefits were never taken away by Def. Delta as a result of any other previous "medical leave," before 2018, when Plaintiff did not engage in protected activity(engaging with a lawyer to file a Workers Compensation claim, testifying in support of a former Delta employee in a Title VII sex discrimination case, notice of testifying in support of a former Delta employee in a Workers Compensation case, telling Defendant Delta that Plaintiff had a disability(mobility impairment) in September 2018, requesting to use CFRA/FMLA).

123.Due to ***temporal proximity of less than 3 months***, Defendant Delta's and/or its managing agents' **RETALIATION** is inferred by the **casual connection** between the **protected activities Plaintiff engaged in** (for example : Plaintiff's August/September 2018 engaging with a lawyer to file a Workers Compensation claim, Plaintiff's September 2018 testimony in support of a former Delta employee in a Title VII sex discrimination case, late September/early October 2018 notice of Plaintiff's future testimony in support of a former Delta employee in a Workers Compensation case, Plaintiff's September 2018 notice to Defendant Delta that Plaintiff had a disability(mobility impairment, and  Plaintiff's September 2018 request to use CFRA/FMLA) **AND** the immediate and subsequent revocation of Plaintiff's material benefits **(1) shift swapping benefits (2) seniority bid shift benefits, (3)Delta pass travel benefits, and/or (4) ability to ask for days off (free exercise of Plaintiff's rights under CFRA/FMLACalifornia State Labor laws.)**

124.Delta's Ready Reserve employees are contract employees, whereby the Ready Reserve contract entitles Ready Reserve contract employees (1) shift swapping benefits (2) seniority bid shift benefits, (3)Delta pass travel benefits, and/or (4) ability to ask for days off (free exercise of Plaintiff's rights under CFRA/FMLACalifornia State Labor laws.) 5) ability to use personal and/or sick days.

125.Because Plaintiff was and/or became #1 seniority Ready Reserve employee at some point in 2018, Plaintiff was entitled to any shift line and/or weekly shift that she both desired and/or was available in the seniority bid shift selection process that all other similarly situated Ready Reserve employees were allowed to participate in.at Delta Los Angeles LAX airport, Dept 125, in 2018.

126.Because Plaintiff engaged in protected activity from around August 2018 through around October 2018, Defendants retaliated against Plaintiff in October 2018 by revoking Plaintiff's seniority bid shift benefits and/or swapping benefits and/or ability to request a hardship transfer that all other Ready Reserve contract employees are entitled to.For example, On October 31, 2018, Angel Williams, who was a similarly situated Ready Reserve employee with less seniority than Plaintiff, was not told that she was not allowed to bid for an open line and/or that she was not able to select a shift that didn't mirror her previous shift before she went on disability and/or that she (she) was not allowed to bid for a shift in any seniority shift bid selection process and/or that her shift swapping privileges were revoked.

127.As evidence by Exhibits 1 and 2,  on October 31, 2018, similarly situated employee, Angel Williams, who was also returning and/or returned from a "medical leave" in the same month as Plaintiff, did not have her shift swapping benefits, travel benefits, and/or seniority bid shifting benefits revoked by Defendants upon her return from a medical leave.

128.As evidence by Exhibits 1 and 2, on October 31, 2018, similarly situated employee, Angel Williams, who has and/or had  less seniority than Plaintiff, was allowed by Defendants to choose the shift she preferred, which was the 8:30AM-12:30PM shift that Plaintiff would have preferred if —

**AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

Defendants would have been allowed Plaintiff to select a shift the way Defendants let Angel Williams select a shift when she returned from a medical leave.

129. But for Defendants retaliation based on Plaintiff's engagement in protected activities, Plaintiff would have been entitled to select the 8:30 AM -12:30 PM shift that Angel Williams selected in October 2018, as Plaintiff had more seniority over Angel Williams, who was a similarly situated employee in all material aspects.

130. The only difference between Plaintiff and Angel Williams was that Angel Williams did not engage in any of the protected activities less than a few months before returning from medical leave , as Plaintiff engaged in protected activities between August through October 2018.

131. Angel Williams, who was a similarly situated Delta employee in all material aspects, did not engage in any and/or all of the protected activities that Plaintiff engaged in between August through October 2018, nor did Angel exercise her rights under FMLA in September/October 2018.

132. Based on Plaintiff's seniority and/ or the fact that Plaintiff returned to work from a medical leave before Angel Williams returned to work from a. medical leave, , Plaintiff was entitled to and/or needed to select and/or preferred  the 8:30 AM -12:30 PM shift that Angel Williams was allowed to select because it was a shift that Plaintiff could easily drop and/or swap with other employees, as these employees preferred to pick up and/or swap this specific shift with Delta's shift swapping benefits, which would've allowed Plaintiff more flexibility to go to physical therapy, attend doctor's appointments, look for a room and/or apartment to live in as Plaintiff was homeless, and/or allow Plaintiff the opportunity to earn more income by picking up more hours, or seek treatment for migraines ,

133. Because Defendants intentionally and maliciously revoked Plaintiff's **seniority bid shifting benefits in retaliation f**or Plaintiff engaging in protected activity, Plaintiff was denied opportunity to select the shift she preferred in October 2018 , which directly caused Plaintiff to sustain economic harm, loss of wages and/or loss of income, increased physical pain due to her disability and workers compensation injury, emotional distress, and  prolonged period of homelessness, ,impairment of contract,

134. Around October/November 2018, Plaintiff spoke to/inquired/asked Def. Turnpap, "I've been here for around 13 years and I see white females, who are external applicants (non Delta employees), who have less experience and qualifications than I do, who are promoted to flight attendant positions or managerial positions or IFS FSM positions. Yet I've interviewed for the flight attendant position, and after all my years of customer service here and nursing classes, it seems impossible to ever be promoted to do other positions outside of this department, which is basically an entry level position, that I'm still in after 13 years." Def. Turnpap told me, "Well, Delta wants fresh faced, young, early twenty something year old thin white girls, who are gonna look sexy in that red dress. Delta doesn't really want older, big black mamas or these ghetto nappy headed hoes from ACS. Older big black mamas aren't going to look sexy in that red dress and their big ol bootys cant fit on the jump seat and then they are gonna be bumping people in the 737 air planes aisles  because they are going to have to bend down and squat in that red dress when doing beverage service. We all know Delta wants only young white girls and you cant do anything about your age, but consider getting a makeover and changing your image to what I told you Delta wants, loss some weight, don't wear your fro, and just act like a happy dumb blonde white girl, and maybe next time you'll be promoted to the flight attendant position. I don't want to kill your dream of being a flight attendant, but Delta is desperately trying to put all our old white senior mama heifer flight attendants out to pasture, so Delta probably wont promote you to flight attendant because you are around 40, they don't want   40-ish black women like you who wear their natural hair and got all that junk in your trunk to be a flight attendant.

**AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

(see Ex 17, pg 3, Lines 6-7)

Delta also doesn't want any of our old, stale, washed up ACS bag hags who've had workplace injuries and disabilities and are constantly using FMLA or going out on disability leaves because you will be using FMLA to call out at the last minute and you'll be a threat to our on-time operation. Thats why    Delta needs young healthy white girl flight attendants  because they come to work on time,  don't complying about racism, smile and look sexy in that red dress.  If you want to be promoted, don't ever request FMLA leave again or go out on any disability leaves or ask for any more reasonable accommodations because you will never be promoted. You already, every other strike against you, your black, your getting old, we all know you have a disability, and you always use FMLA and asked for a few reasonable accommodations and had OJI, so you will probably never be promoted. You are already walking on thin ice as it is, so you should just feel lucky you even still have a job or that Delta did not  terminate you after all those emails you sent accusing us of discrimination."

135. After Plaintiff's conversation with Def. Turnpap about how Plaintiff can become a flight attendant or get a promotion at Delta, every time Def. Turnpap saw Plaintiff after that day, Turnpap also made constant comments about Plaintiff wearing her natural African hair. On one instance in November 2018, Def. Turnpap told me, "Erika, I told you not to wear your nappy fro to work, your hair looks too wild and unprofessional, and I need you to go on a diet, I need you to look more sexy, I need you to start wearing the navy blue dress and heels, and I need you to appear more passive, more welcoming and I need to see you always smiling in front of the customers and flirting with these white male HVC's. You told me you wanted to be a flight attendant and be promoted, I'm just trying to help you since you asked me for career advice."  Plaintiff explained to Def. Turnpap that because she was disabled, homeless and did not have enough money to even afford to rent a room and/or an apartment, Plaintiff did not have enough money to get her hair straightened to look like a white woman, so Plaintiff had to come to work with her natural African hair because her #1 priority was working as many hours as possible to earn high paychecks above $300.00 so Plaintiff can find a place to live while focusing on  getting medical treatment for her disability. Because of Def. Turnpap's disapproving comments and/or threats about Plaintiff's natural African hair, Plaintiff was scared that she was going to be terminated and/or be subjected to more adverse employment actions and/or revocation of other material benefits, in violation of her employment contract, because of  Def. Turnpap's racial discrimination, as he did not like Plaintiff wearing her natural African hair.  Plaintiff later reported Def. Turnpap's comments to Def Rangel, who told Plaintiff, "Delta gives us the discretion to make professional suggestions about your appearance, to make sure you are complying with Delta's uniform policy. JoJo (referring to Turnpap) was just trying to help you, you asked him for advice, so he is coaching you, as he wants you to look more polished.  JoJo is right, Delta does prefer thin, young, white females with straight hair who will look sexy and glamorous in that red dress, its part of our brand. Delta  wont hire you as a flight attendants if you have a fro and because you are a big boned black woman.  I'm a big white woman and I know Delta wouldn't hire me as a flight attendant unless I made some changes to my appearance, so we are just helping you grow here at Delta.  Jojo and I are just giving you suggestions for a more professional image so we can get the JD Power Award, we encourage you to get your hair done because it doesn't look sleek or professional, loss a few pounds,  start wearing that navy blue dress with some heels and be a team player. Uniform compliance and the Image of our customer service agents is very important to our brand. We need to see  you making an effort to be more feminine and glamourous. Delta is really tired of all you raggedy, frumpy, old bag hags who look so sloppy in uniform, its one reason we have

**AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

1   been unable to win the JD Power Award and Delta is just pushing our managers to motivate our
2   customer service agents to change, thats all JoJo was doing. It's not about your race. We've also have
    been telling the white bag hags to stop looking so sloppy as well."
3   136.Because Plaintiff has/had a disability and mobility impairment, it is/was uncomfortable and
    difficult for Plaintiff to wear heels and/or a dress, and/or to look "sexy."
4   137.Since October 2018, Plaintiff, because of her race and sex, was constantly subjected to a
5   extremely racially and sexually hostile work environment by Defendant Turnpap, an Asian
    heterosexual male, as Plaintiff was always harassed by Def. Turnpap to look, act, and be "sexy" and
6   to "flirt" with white men to help Delta win the JD Power Award and to look more like a white woman
7   by criticizing my natural African hair.  When Plaintiff opposed Def. Turnpap's racially and sexually
    hostile work environment by complaining to Def. Rangel, Def. Rangel , Delta's HR Manager told
8   Plaintiff that it was part of Def. Turnpap's  job as Delta manager to be making those racially and
9   sexually discrimination comments to Plaintiff. Even after Plaintiff transferred out of the LAX Los
    Angeles airport,  Plaintiff was still subjected to a similar racially and sexually hostile work
10  environment when the next manager/supervisor Kamasi, made similar sexual and racially
11  discriminatory comments about Plaintiff, because of her sex and race, which was a continual
    violation of a hostile work environment. Plaintiff's complaints about the racially and sexually hostile
12  work environment around October 2018, February 21, April 2019 is evidence that Plaintiff objectively
13  and subjectively perceived her work environment to be  racially and sexually hostile and abusive,
    because of Plaintiff's sex and race.
14  138. The fact that Plaintiff transferred to another airport location in December 2018 was because
15  Plaintiff applied and/or competed for the job against other applicants, as Delta and/or its managing
    agents refused to interact and/or reasonably accommodate Plaintiff with a hardship transfer.  Delta,
16  Def. Rangel, and/or Delta's managing agents did not grant Plaintiff a transfer based on Plaintiff's
17  request for a reasonable accommodation, as Defendants did with Kimberly Ng, who identifies as a
    white woman.
18  139.Even after Plaintiff transferred to another airport in December 2018, where she escaped the
19  constant retaliation, sex and race discrimination, and severely abusive racially and sexually hostile
    work environment that Plaintiff was subjected to by Defendants Rangel and Turnpap, Plaintiff,
20  because of her sex and race, was still constantly racially and sexually harassed by Supervisor/
21  Manager Bernadette Kamasi, causing a continual violation that began in late 2019 until mid to
    late 2020
22  , as Supervisor/Manager Bernadette Kamasi also subjected Plaintiff to a severely abusive hostile
    work environment, which Defs. never investigated, until February 2021,
23  140.After Plaintiff transferred to another station, Plaintiff, because of her sex and race, was constantly
    harassed by Supervisor/Manager Bernadette Kamasi, who is a white female lesbian, who had
24  supervisory and/or managerial power over Plaintiff. On or around December 2018/January 2019,
25  Supervisor/Manager Bernadette Kamasi said to Plaintiff, "you have some kinky hair on your head, do
    your drapes match the carpet, I bet your really kinky down there and kinky in bed too. I always
26  wanted to try some black cat," and winked at Plaintiff, while staring at Plaintiff's breasts and crotch.
27  Around this same time period, Supervisor/Manager Bernadette Kamasi asked Plaintiff, "do you shave
    down there or do you have a bush down there too? I need my girls to be hairless down there."
28  Another time, around this same time period, Supervisor/Manager Bernadette Kamasi asked Plaintiff,
    "Is it true that black guys don't eat you black girls out? You must be really deprived of any pleasure. I

**AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

bet I could probably get you off after just a few licks, you will love it." Since Plaintiff began working under Supervisor/Manager Bernadette Kamasi around December 2018, Plaintiff has always been sexually harassed by Supervisor/Manager Bernadette Kamasi, who would always be staring at Plaintiff's butt, breasts and crotch areas, every time Supervisor/Manager Kamasi saw and/or interacted with Plaintiff. Beginning around March 2018, Supervisor/Manager Bernadette Kamasi would always walk by Plaintiff and stick her tongue out     moving her tongue quickly back and forth in a sexually suggestive manner, while making eye contact with Plaintiff, where Kamasi was gesturing and simulating an act of cunnilingus. From around December 2019 through around mid to late 2020, Supervisor/Manager Bernadette Kamasi constantly was begging Plaintiff to let her perform oral sex on Plaintiff with such comments as , "When you going to let taste your sweet black pie, make you cream?" or "I bet a black man has never made you squirt before, but I promise I can make you squirt." or "They say the blacker the berry, the sweeter the juice. I want feel your sweet black juices running down my face.." or "I'm dying to try to fuck your black hole, I have a big white strap on to use on you baby, its bigger than any black man's cock.I'm going to turn you out, watch." Plaintiff suddenly hated going to work, couldn't sleep, couldn't eat, starting feeling nauseous and always stomach cramps before and during and after working hours while being supervised/managed by Bernadette Kamasi  and was tired of laughing it off or ignoring Supervisor/Manager Bernadette Kamasi's requests for sex because of Plaintiff's fear of retaliation, so in March 2019, Plaintiff politely told Supervisor/Manager Bernadette Kamasi, "Excuse me Ma'am, I'm not trying to be disrespectful, but I'm 100% heterosexual, so Im feeling uncomfortable with all your sex talk and your questions about my vagina and your desire to try black cat, comments about my hair being too kinky and the sexual acts that black men perform or don't perform  in bed and your sexual skills and abilities. I'm not interested in being with you sexually, so lets keep it strictly professional, you are like my manager."

141. Around March 2019, after Plaintiff opposed Supervisor/Manager Bernadette Kamasi's sexually and racially hostile work environment, Supervisor/Manager Bernadette Kamasi began threatening Plaintiff with adverse employment actions and make false accusations about Plaintiff allegedly not complying with Delta's uniform and appearance guidelines. For example, Supervisor/Manager Bernadette Kamasi made racially disparaging comments about Plaintiff's wearing her natural African hair to work, threatening Plaintiff that Plaintiff  would be written up for not adhering to Delta's uniform policy regarding, which was racially discriminatory in nature, as Supervisor/Manager Bernadette Kamasi told Plaintiff  around March/April 2019, "your natural hair look horrible and unprofessional and is not in compliance with Delta policy, I'm going to have you written up." Supervisor/Manager Bernadette Kamasi, also, then told Plaintiff, "Your shoes are not uniform complaint and your going to get written up for that too because I've warned you many times about those ugly cheap shoes." Plaintiff then told Supervisor/Manager Bernadette Kamasi that another white woman wears identical shoes and has never been written up, as these shoes are complaint with Delta's uniform policy guidelines. Plaintiff then emailed Delta's Equal Opportunity Department and complained about Supervisor/Manager Bernadette Kamasi's constant harassment and had a phone conversation with Delta's Equal Opportunity Department about Supervisor/Manager Bernadette Kamasi harassing Plaintiff, based on her sex and race. Delta's Equal Opportunity Department later confirmed with Plaintiff that Plaintiff is allowed to wear her natural African hair at work and that Plaintiff's shoes have always been in compliance with Delta's uniform policy guidelines. Since

**AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

1    around April 2019, Delta was aware that Plaintiff opposed Supervisor/Manager Bernadette Kamasi's

2    sex and race based harassment and/or hostile work environment at all times.

     142. Def. Delta has a progressive discipline policy and/or a corrective action policy.

3    A FVC is the first step in Delta Air Lines' progressive discipline policy and expires in 1 year and/or

4    stays in an employee's personnel file for 1 year. When a Delta employee is given a FVC, for a

     violation and/or alleged violation of a Delta company policy, the Delta employee is not provided with

5    a written document by Delta and/or its managing agents informing and/or specifying and/or

6    explaining the reasons and/or violation of the Delta company policy that the Delta employee

     allegedly violated. Basically, a Delta employee is only aware that he or she received a FVC, the first

7    step in Delta's corrective action/progressive discipline policy, when a Supervisor and/or Manager

8    verbally informs the Delta employee, as Supervisor/Manager Bernadette Kamasi informed Plaintiff

     verbally.

9    143. After Plaintiff opposed Supervisor/Manager Bernadette Kamasi's sex and/or race discrimination,

     Supervisor/Manager Bernadette Kamasi informed Plaintiff that Plaintiff would be receiving an

10   adverse employment action, FVC, when Supervisor/Manager Bernadette Kamasi told Plaintiff in

11   2019, "you are getting a FVC for non compliance with Delta's uniform policy because I

     previously warned you about your kinky hair and shoes and you keep refusing to make the changes I

12   asked you to make."

13   144. Plaintiff engaged in protected activity when Plaintiff opposed Supervisor/Manager Bernadette

     Kamasi's constant sexually and/or racially harassing comments in or around March 2019. (see

14   Castro-Ramirez v. Dependable Highway Express, Inc. (2016) 2 Cal.App.5th 1028, 1046;see also

     Govt. Code § 12940(m)(2).)

15   145. Upon information and belief. as according to Supervisor/Manager Bernadette Kamasi, Plaintiff

16   received an adverse employment action, called a FVC, in 2019, in retaliation for opposing race/sex discrimination

     146. The temporal proximity in time, less than 3 months, between Plaintiff's March 2019 opposition

17   to Supervisor/Manager Bernadette Kamasi's constant sexually and/or racially harassing comments

18   and the alleged FVC (around April 2019) proves the casual link between the protected activity.

     147. In 2019, after Plaintiff reported Supervisor/Manager Bernadette Kamasi's constant sexually and/

19   or racially harassing comments to Def. Delta's Equal Opportunity Department,  Def. Delta's Equal

20   Opportunity Department determined that Plaintiff did not violate Delta's uniform policy by wearing

     the shoes that Supervisor/Manager Bernadette Kamasi arbitrarily found non-compliant but also that

21   Plaintiff did not violate Delta's uniform policy by wearing her natural "kinky" hair. which is a racial

22   characteristic based on Plaintiff's race.

     148. Because Def. Delta's Equal Opportunity Department determined that Plaintiff did not violate

23   Delta's uniform policy in 2019 based on the "shoes" and or Plaintiff's "kinky hair," there is an

     inference of retaliation, as Supervisor/Manager Bernadette Kamasi had no reason to retaliate against

24   Plaintiff with the alleged adverse employment action of a FVC, but for her opposition to race/sex harassment

25   149. from late 2017-2020,  Plaintiff, because of her sex and race, was subjected to outrageous

26   conduct by Delta's Supervisor/Manager Bernadette Kamasi, who constantly made sexually and/or

     racially harassing comments and sexually suggestive gestures with her tongue towards Plaintiff.

27   150 From late 2017-2020, Delta's Supervisor/Manager Bernadette Kamasi, acted with reckless

28   disregard of the fact that her conduct would cause Plaintiff emotional distress when she constantly

     made sexually and/or racially harassing comments and gestures towards Plaintiff, because of

     Plaintiff's sex and race.

**AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

Case 2:20-cv-08754-CBM-JEM   Document 28   Filed 03/08/21   Page 26 of 67   Page ID #:551

151. Because of Delta's Supervisor/Manager Bernadette Kamasi's outrageous sexually and racially harassing conduct targeted at Plaintiff, 2017 *thru* 2020, Plaintiff suffered severe emotional distress, mental anguish, fright, fear, horror, grief, shame, humiliation, embarrassment, anger, disappointment, worry, etc. at a level that no reasonable person should be expected to endure.

152. Delta's Supervisor/Manager Bernadette Kamasi's outrageous sexually and racially harassing conduct targeted at Plaintiff in 2017 *thru* 2020 was a substantial factor in causing Plaintiff emotional distress.("if properly pled, sexual harassment will constitute the outrageous behavior element of a cause of action for intentional infliction of emotional distress... ." (Fisher, 214 Cal.App.3d at 618.)

153. At all times mentioned herein, Plaintiff was performing competently in the job position she held at Delta Air Lines, Inc, more specifically from June 2016 through 2020.

154. As of *March 02,* 2020, Plaintiff is still employed by Delta Air Lines, Inc.

155. Upon Plaintiff's return to work from previous "medical leaves," Plaintiff was always able to immediately swap and ask for days off and keep the shift that Plaintiff chose in the seniority bid shift process that all similarly situated active Delta employees participate in and/or never had her Delta pass travel benefits revoked.

156. **As evidenced by Exhibits 1 and/or 2,** Plaintiff opposed Defendants violations of CFRA, FMLA, and California State Labor laws, when Plaintiff emailed Defendants Rangel and/or Turnpap stating the fact that **"George McCullough, a co-worker when he came back from medical leave he was able bid for a shift line, swap shifts, and ask for days off."** *in 2018.*

157. As evidenced by Exhibits 1 and/or 2, Defendants discriminated against Plaintiff, because of her sex, in violation of FEHA, Title VII, CFRA, FMLA, and California state labor laws, when Defendants allowed "George McCullough," a similarly situated male comparator employee, to "ask for days off…when he came back from medical leave" and "bid for a shift line" and "swap shifts."

158. As evidenced by Exhibits 1 and/or 2, on November 9, 2018, Plaintiff further opposed Defendants Rangel and/or Turnpap's retaliation and discrimination, when Plaintiff emailed Melissa Chapman.

159. Def. Delta and/or its managing agents *intentionally* revoked Plaintiff's material benefits *in 2018, it* was the substantial factor causing Plaintiff to sustain economic harm and/or loss of income and/or previously earned income*, and future income, impairing Plaintiff's employment contract, in violation of 1981.*

160. Upon Plaintiff's return from an approved disability leave in October 2018, Plaintiff was informed by Defendants that she was prohibited from calling out sick and/or using any sick days and/or personal days, which is explicit violation of CFRA, FMLA, and California state labor laws.

161. As evidenced by Exhibit 1 and/or 2 , Defendant Delta admitted in these emails that Plaintiff was not out on a long term leave.

162. As evidenced by Exhibit 1, because Defendant Delta admitted in this email that Def. Delta and/or ~~its managing agents treated George McCullough, a similarly situated male, according to Delta~~ ~~company policy.~~

~~163.~~ There is an inference of sex discrimination, as Def. Delta and/or its managing agents disparately treated Plaintiff, because of her sex, by revoking her material benefits when she returned from an approved disability leave, causing her to sustain economic harm, that male employees were not subjected to.

164. The only difference between Plaintiff and George McCullough is their gender.

**AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

165. As evidenced by Exhibit 1 and/or 2 ,Def. Rangel admitted in this email that Def. Delta and/or its managing agents treated George, McCullough, a similarly situated male comparator, according to Delta company policy.

166. Plaintiff, a female, was disparately treated upon her return from a disability leave *treating plaintiff differently →* than Def. Delta and/or its managing agents treated George McCullough, a similarly situated male comparator, according to Delta company policy.

167. Because of Plaintiff's *race (black)*, Def. Delta and/or Def. Rangel and/or Def. Turnpap disparately discriminated against Plaintiff in or around September and/or October 2018 when Delta and/or all Defendants revoked Plaintiff's shift swapping privileges and/or seniority based shift bidding privileges, *as Def. delta only revoked Sharon Lewis's (similarly situated white woman) swap benefits* *in violation of policy →* *for*

168. From December 2018 *mid/late 2020*, because of her sex (female) and/or race (black/African American), Plaintiff was sexually and/or racially harassed by Delta's Supervisor/Manager Bernadette Kamasi, who had supervisory and/or managerial power over Plaintiff.

169. From *late* 2017-2019, because of Plaintiff's sex (female) and/or Plaintiff's race (black/African American), Plaintiff was subjected to unwelcome sexual and/or racial harassment by Defendant Turnpap, who had Managerial power over Plaintiff, *and/or* Delta's Supervisor/Manager Bernadette Kamasi, who had supervisory and/or managerial power over Plaintiff.

170. From *late* 2017-2019, because of Plaintiff's sex (female) and/or Plaintiff's race (black/African American), Defendant Turnpap and *or* Delta's Supervisor/Manager Bernadette Kamasi, subjected Plaintiff to an abusive and hostile working environment, with their individual and/or collective unwelcomed, severe, and constant sexual and/or racially harassment which altered the terms and conditions of Plaintiff's employment with Def. Delta Air Lines, Inc. See *Fisher v. San Pedro Peninsula Hospital (1989) 214 Cal.App.3d 590, 608.*

171. At all times from *early* 2018-2021, Plaintiff objectively and subjectively perceived herself to working in a severely abusive and hostile working environment, *when* Defendant Turnpap, Delta's LAX Manager, and *for* Delta's Supervisor/Manager Bernadette Kamasi, subjected Plaintiff to an abusive and hostile working environment, based on her sex and race, with their unwelcomed, severe, and constant sexual and/or racially harassment which altered the terms and conditions of Plaintiff's employment with Def. Delta Air Lines, Inc. See *Fisher v. San Pedro Peninsula Hospital (1989) 214 Cal.App.3d 590, 608.*

172. Because of Defendant Turnpap's 2018 conduct, Plaintiff, because of her race and sex and disability and for engaging in protected activity, objectively and subjectively perceived herself to working in a severely abusive and hostile working environment at Los Angeles LAX Airport , which is part of the reason Plaintiff asked Def. Delta and/or its managing agents, Def. Rangel and/or Delta's Equal Opportunity Department in Atlanta, GA, for a job hardship transfer, so that Plaintiff would no longer be subjected to Defendant Turnpap  constant sexually and racially based harassment, that was neither trivial, occasional, isolated or sporadic, which Def. Rangel aided and abetted when Def. Rangel ratified Def. Turnpap's conduct by telling Plaintiff that Def. Turnpap's sexually *and* racially harassing comments were part of his managerial duties, to assist Def. Delta in earning the JD Power Award.

173. Upon information and belief, an anonymous complaint was filed to Delta's hotline in regards to the severely abusive and hostile working environment that *Kamasi,* Defendant Turnpap and/or Def. Rangel subjected Plaintiff to in 2018.

*THIRD* **AMENDED VERIFIED COMPLAINT FOR DAMAGES (JURY TRIAL DEMANDED)**

*+ Komasi S*

*Komasi &*

174. Def. Rangel, Delta's HR Manager, aided and abetted Def. Turnpap's sexual and racial harassment targeted at Plaintiff, by refusing to do anything after Plaintiff informed Def. Rangel of Def. Turnpap's sexual and racial harassing comments and/or by Def. Rangel's refusal and/or failure to reasonably accommodate Plaintiff with a job transfer, so Plaintiff would no longer be working in a severely abusive and hostile working environment at Los Angeles Airport that Def. Turnpap subjected Plaintiff to, which was part of the reason that Plaintiff requested a reasonable accommodation in October 2018 again, whereby Def. Rangel failed to engage in a good-faith interactive process at all times. See Fiol v. Doellsted (1996) 50 Cal.App.4th 1318,1327.)

*175.* Around October/November 2018 through around mid- 2019,  Plaintiff made several reasonable accommodation requests to Defendants by requesting  1) a job transfer and/or 2)reassignment to a vacant position, and/or 3) part-time or modified work schedules,

After October/November 2018 when  Plaintiff made several reasonable accommodation requests to Defendants,  Defendants failed to interact and failed to accommodate Plaintiff after Plaintiff requested a reasonable accommodation requests for 1) a job transfer and/or 2)reassignment to a vacant position, and/or 3) part-time or modified work schedules. *in violation of SB 700 & FEHA.*

176. Because Defendants failed to interact at any time, beginning in October 2018, Defendants never evaluated Plaintiff's mobility impairments and/or the extent of her  disability, to determine whether or not Plaintiff was or was not disabled under the FEHA.

177. From 2018-2020, Plaintiff's mobility impairment limited several major life activities, such as working, which is considered a major life activity under the FEHA. (See Gov. Code §§ 12926(i)(1) (C); 12926(k)(1)(B)(iii).) *, as does depression and anxiety.*

178. Because whether or not Plaintiff is disabled is to be evaluated without taking into account the salutary effects of any mitigating measures, such as medication, prosthetics, and the like,  (Gov. Code § 12926(k)(1)(B)(i).), Def. Delta and/or Delta's managing agents, specifically Def. Rangel failed to ever evaluate Plaintiff's disability as Def. Delta failed to properly engage in a good faith interactive process with Plaintiff, as Def. Rangel was responsible to do as the local HR manager, according to JoAnn Guerrant's testimony in Lewis v. Delta, as JoAnn Guerrant is an HR Manager in Delta's Equal Opportunity Department.

179. Def. Delta and/or Delta's managing agents failed in its affirmative duties to  figure out ways to 1) work around Plaintiff's disability when Def. Delta and/or Delta's managing agents failed to engage in the interactive process with Plaintiff  and/or failed to reasonably accommodate Plaintiff in 2018 and/ or 2019. (Gov. Code § 12940(n); Prilliman v. United Air Lines, Inc., (1997) 62 Cal.Rptr.2d 142, 149-150); *2021,*

180. Def. Delta and/or Delta's managing agent, specifically Def. Rangel,  failed in its/ her affirmative ~~duty to engage Plaintiff in a good-faith interactive process, that is, to sit down with Plaintiff and~~ discuss her reasonable accommodation requests, to work cooperatively to find ways to keep Plaintiff working with her disability. (Gov. Code § 12940(n); Jensen v. Wells Fargo Bank (2000) 85 Cal.App. 4th 245, 261.)

181. Plaintiff was able to perform all of the essential functions of her position with or without a reasonable accommodation, *from October 2018 through February 2021.*

182. Plaintiff was never required to prove she is a qualified individual because of her disability under the FEHA. Rather, the burden is on Defendants to establish that plaintiff is/was incapable of performing her essential duties with the reasonable accommodations she requested from Defendants,

1   beginning around October 2018. See Section 12940(a);Green v. State of California (2006) 33
2   Cal.Rptr.3d 254, 262;Gelfo v. Lockheed Martin (2006) 140 Cal.App.4th 34
    183.Plaintiff was under no requirement to be "100 percent healed" before returning to work and/or
3   asking for a reasonable accommodation. A policy requiring an employee be "100 percent healed"
    before returning to work is a per se violation even under the ADA and/or FEHA.
4   184.Plaintiff's disability(mobility impairment) and/or depression/anxiety/PTSD is covered by the
5   FEHA.
    185.Plaintiff is a qualified individual under the FEHA , meaning Plaintiff was able to  perform the
6   essential functions of the job position from October 2018- present, with or without a reasonable
7   accommodation
    186. Def. Delta and/or its managing agents, failed to reasonably accommodate plaintiff's disabilityes
8   and/or even engage in  a good-faith interactive process to determine what accommodations were
9   reasonable. (see Jensen v. Wells Fargo Bank (2000) 85 Cal.App.4th 245, 256; see also Govt. Code §
    12940(m)(1).)
10  187.Def. Turnpap and/or Supervisor/Manager Kamasi's conduct was harassing under the FEHA as it
11  was "not necessary for management of the employer's business or performance of the supervisory
    employee's job." See (Govt. Code § 12940(j)(1):Janken v. GM Hughes Electronics (1996) 46
12  Cal.App.4th 55; (See also Reno v. Baird (1998) 18 Cal.4th 640, 645, superseded by statute on other
13  grounds [distinguishing between acts related to personnel management, such as job assignments, and
    harassing conduct)
14  188.As evidenced by Exhibits 1 and/or 2, Def. Delta and/or Def. Rangel were aware in October 2018
15  that Plaintiff was both previously out on a "medical leave" in 2016 and/or that Plaintiff was out in
    2018 based on an on the job injury that Plaintiff sustained at Los Angeles Airport , where  Plaintiff
16  was undergoing treatment and/or physical therapy for these workplace injuries Plaintiff sustained
    while working for Delta, which proves that Plaintiff was perceived to have at the very least a
17  temporary and/or long term disability since it required physical Therapy, necessitating a  medical
18  leave.
    189.In 2018 Def. Delta and/or Def. Rangel failed to engage in the interactive process  to determine
19  effective reasonable accommodations, if any, in response to Plaintiff's request for a reasonable
20  accommodation with a known physical or mental disability or known medical condition, and then
    subsequently failed to accommodate Plaintiff's reasonable accommodation request in violation of
21  Govt. Code § 12940(n).)
    and Govt. Code § 12940(m)(1). (Soria v. Univision Radio Los Angeles, Inc. (2016) 5 Cal.App.5th
22  570, 598, 600.)
23  190.In 2018, Plaintiff not only suffered from a disability that Def. Delta and/or Delta's managing
24  agents were aware of but , Def. Delta  and/or Def. Rangel regarded Plaintiff as suffering from a
    disability, based at least partially on her 2016 "medical leave," as evidenced by Exhibits 1 and/or 2,
25  and/or at least partially on Plaintiff's 2018 "medical leave," based on the on the job "OJI" injuries
    Plaintiff sustained while working for Delta at LAX Airport in Los Angeles, CA.
26  191. Upon information and belief, Plaintiff was subjected to an adverse employment action, FVC,
27  and her revocation of material benefits  because of her disability and/or perceived disability and/or
    based on her reasonable accommodations to Def. Delta and/or its managing agents.
28  192.Plaintiff, who is, African American(black), is  a member of a racial minority,

193. Defendant Delta and/or Defendants Rangel and/or Turnip intended to discriminate against her on (Plaintiff) the basis of her African American race;

194. In 2018, Def. Joseph Turnpap told Plaintiff that he is Asian.

195. In 2018, Def. Ashley Rangel told Plaintiff she is white.

196. Since 2005 and/or from October 2018 though December 2020, Plaintiff has and/or had a Ready Reserve employment contract with Def. Delta Air. Lines. Inc.

197. Because of Plaintiff's race, Defendants Rangel and/or Turnpap, in 2018, intentionally impaired, modified, and interfered with Plaintiff's employment contract and/or the enforcement and the "enjoyment of all benefits, privileges, terms and conditions" of Plaintiff's Ready Reserve employment contract with Delta Air Lines, inc.in violation of Title 42 of the United States Code section 1981.

198. Because of Plaintiff's race, Defendants Delta, Rangel and/or Turnpap, in 2018, disparately treated Plaintiff by treating Kimberly Ng, a similarly situated non-black employee, more favorably, by giving her a transfer to another station while on medical leave, while she was in "Inactive status," which. Defendants Delta, Rangel and/or Turnpap, in 2018, refused to do when Plaintiff requested a transfer while in "inactive" status and/or on medical leave and/or when Plaintiff requested a reasonable accommodation for a hardship transfer. But for Plaintiff's race ,Plaintiff, a black woman, would been reasonably accommodated with a transfer, the way, Kimberly Ng, a similarly situated (white) non-black employee, was given a transfer, while out on medical leave and/or in "inactive" status. In fact, Kimberly Ng, specifically told Plaintiff that Kimberly Ng never, at any time, went back to LAX airport, for even one hour and/or one day after she return from medical leave around early January 2019.

199. Around December 2018/January 2019, Kimberly Ng, was/is a similarly situated Los Angeles LAX non-black Delta employee, who was out on medical leave, maternity leave , but was given a transfer to another airport while she was an "inactive" employee and/or while Kimberly Ng was in "Inactive status," as she was on an approved medical leave and/or FMLA leave,

200. In 2018, but Prior to October 2018, Def. Rangel told Plaintiff, who is black, that Plaintiff was not allowed to request or apply for and/or be granted a hardship transfer while Plaintiff was on a medical leave, yet Def. Rangel and/or Def. Delta granted Kimberly Ng, who is not black, a transfer from LAX to another airport, in or around December 2018 and/or January 2019.

201. Around December 2018/January 2019, Kimberly Ng, who was/is a similarly situated non-black Delta employee, was out on maternity leave and was given a transfer while she wasn't an active employee and/or while Kimbery Ng was in "Inactive status."

Delta 202 Around December 2018/ January 2019, Kimberly Ng, personally told Plaintiff that she was given a transfer from LAX airport to another airport, while she was out on a FMLA / CFRA leave, and/or a Medical leave and/or maternity leave, and that Def. Rangel processed Kimberly Ng's transfer while Kimberly Ng was out on a maternity leave.

203. In January 2019, Kimberly Ng told Plaintiff that she is white woman, even though only one of her parents is partially Asian but that Kimberly identifies as and/or is mostly a white woman.

204. Because of Plaintiff's race, Def. Rangel, who is white, treated Plaintiff, who is black, differently than Kimberly Ng, who identifies as a white woman, was/is a similarly situated Los Angeles non-black Delta employee.

205. In January 2019, Kimberly Ng and Plaintiff were working in the same department at the same time at the same airport.

206. When Plaintiff found out in January 2019 that Def. Rangel and/or Def. Delta treated Kimberly Ng, a white woman, more favorably than Plaintiff, a black woman, by granting Kimberly Ng a transfer, while out on maternity leave, Plaintiff called Def. Rangel in January 2019 and asked Def. Rangel why Kimberly Ng, who is a white woman, was treated more favorably than Plaintiff, Def. Rangel told Plaintiff "well, Kimberly is different than you are, we are not all the same, you are not Kimberly, so don't worry about Kimberly, worry about yourself, I cant tell you why I gave Kimberly a transfer while she was out on medical leave and why I told you that you were not allowed to apply or request a transfer to the same location, while you were out on a medical leave .Erika ,you have to expect to be treated differently here at Delta, stop comparing yourself to other people, you are not the same as Kimberly," Plaintiff then asked Def Rangel, "Ashely, what does that mean exactly? Is it because of my race? I believe you are discriminating against me because of my race. I know I am not Kimberly, and that I am Erika,  but you always make one set of rules for blacks and other sets of rules for whites or non-blacks ,and these rules you make are not Delta company policy and usually cant be found in any Delta company employee manual."

207. The only difference between similarly situated Delta employees Kimberly Ng,  who is white, and Plaintiff, who is black, is their race.

208. Def. Delta and/or Def. Rangel treated similarly situated Delta employee Kimberly Ng, who is white, more favorably than Plaintiff, who is black, by giving Kimberly Ng a transfer around December 2018, to another station when Kimberly Ng was an inactive employee, when Def. Rangel specifically told Plaintiff both before October and/or in October 2018 and/or November 2018 and/or December 2018 that neither Delta or Def. Rangel can provide Plaintiff with a transfer and/or the reasonable accommodation of a hardship transfer while Plaintiff was "inactive" and/or on a medical leave, but at the same time Delta or Def. Rangel did provide Kimberly Ng with a transfer while she was "inactive" and/or on a medical leave, in violation of FEHA, SB 400 & California public policy.

209. Kimberly Ng,  who is white, did not ask for a reasonable accommodation of. a transfer when asking to be transferred while out on a medical leave around December 2018.

210. Plaintiff demonstrated pretext with this Amended Verified Complaint based on her testimony and based on her showing of disparate treatment and/or policy enforcement, which is a permissible means to establish pretext.  (See, e.g., McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792, 804 ["Especially relevant to such a showing [of pretext] would be evidence that white employees involved in acts against petitioner of comparable seriousness to the 'stall-in' were nevertheless retained or rehired"].)(  Another employee is similarly situated if, among other things, he or she " engaged in the same conduct without any mitigating or distinguishing circumstances.' '"  (Marquez v. Bridgestone/Firestone, Inc. (8th Cir.2004) 353 F.3d 1037, 1038 (Marquez )

211.    Under 2 Cal. Code Regs., tit. 2 § 11069(d)(1) and/or the CFRA regulations, Def. Rangel was prohibited from asking Plaintiff what her serious medical condition.

212.    In 2018, Def. Rangel violated 2 Cal. Code Regs., tit. 2 § 11069(d)(1) and the CFRA by asking Plaintiff why Plaintiff needed to take CFRA leave.

213.    In 2018 ,after Plaintiff told Def. Rangel that she needed to take CFRA leave for her "migraines," Def. Rangel interfered and/or restrained Plaintiff's CFRA rights by denying Plaintiff the ability to take CFRA leave because it was due to Plaintiff's migraines, which Def. Rangel, "Your migraines don't qualify for a leave under CFRA."

214.    After Plaintiff notified Defendants, in early 2018, that Plaintiff was being stalked, sexually harassed and/or sexually assaulted by Bernadette Komasi, Defendants refused to provide job transfer, modified schedule, assistance in documenting the sexual assault and/or stalking and/or job reassignment and/or permanent or temporary relocation in late 2018 and/or 2019 , in violation of S.B. 400

215.    After Plaintiff notified Defendants, in early 2018, that Plaintiff was being stalked, sexually harassed and/or sexually assaulted by Bernadette Komasi, Defendants refused to provide job transfer, modified schedule, assistance in documenting the sexual assault and/or stalking and/or job reassignment and/or unpaid time off for up to 12 weeks to obtain psychological counseling, safety planning, such as permanent or temporary relocation in late 2018 and/or 2019, in violation of California Labor Codes 230 and 230.1.

216.    After Plaintiff notified Defendants, in early 2018, that Plaintiff was being stalked, sexually harassed and/or sexually assaulted by Bernadette Komasi, Defendants refused to reasonably accommodate Plaintiff, such as providing a job transfer, modified schedule, assistance in documenting the sexual assault and/or stalking and/or with a job reassignment and/or permanent or temporary relocation in late 2018 and/or 2019 , in violation of S.B. 400 and/or Labor Codes 230 and 230.1.

217.    Plaintiff made formal, written reasonable accommodation requests via email to Def. Rangel and/or Def. Delta in September 2018 and/or October 2018 and/or November 2018, for transfer.

218.    Defendants violated S.B. 400 by retaliating against Plaintiff after she requested a reasonable accommodation for a transfer, even though Plaintiff's transfer to JFK airport was never granted.

219.    Defendants violated S.B. 400 by refusing to engage in a timely, good faith interactive process with Plaintiff to determine effective reasonable accommodations in response to Plaintiff's September 2018 and/or and/or October 2018 and/or November 2018 formal, written reasonable accommodation requests for a transfer and/or intermittent FMLA.

220.    Defendant Delta and/or Def. Rangel violated the FEHA, ADA, and/or S.B. 400 and/or and/or Labor Codes 230 and 230.1, as they failed and/or refused to engage in a timely, good faith interactive process with Plaintiff to determine effective reasonable accommodations at any time from September 2018 through December 1, 2018 when Plaintiff made formal, written reasonable accommodation requests in September 2018 and/or October 2018 and/or November 2018. _____

THIRD                    **AMENDED VERIFIED COMPLAINT**

221. Because Def. Delta and/or Def. Rangel refused to engage in the interactive process at any time and/or investigate Plaintiff's complaints of sex discrimination and/or retaliation from September 2018- October 2018, Plaintiff filed a DFEH complaint around October 2018.

222. In April 2019, Defendant Delta's Equal Opportunity Department DENIED Plaintiff's formal, written reasonable accommodation requests that Plaintiff made via email in September 2018 and/or October 2018 and/or November 2018.

223. Because Defendant Delta waited until late April 2019, over 6 months, to deny Plaintiff's formal, written reasonable accommodation requests that Plaintiff made via email to Def. Delta and/or Def. Rangel in September 2018 and/or October 2018 and/or November 2018, Def. Delta failed and/or refused to engage in a good faith interactive process with Plaintiff to determine effective reasonable accommodations that was TIMELY under the FEHA in violation of Cal. Gov't Code § 12940(n) and/or Cal. Gov't Code § 12940(m).

224. Upon information and belief, In September/October 2018, Def. Rangel and/or Def. Delta also violated the FEHA when they refused and/or failed to engage in the interactive process, as Def. Rangel and/or Def. Delta were aware that Plaintiff had exhausted the leave provided under some other law, around September 2018 and/or October 2018, and Plaintiff remained unable to work and/or failed to provide Plaintiff with a modified work schedule and/or allowing paid or unpaid leave for treatment and recovery.

225. Working is a major life activity under the FEHA.

226. ) Plaintiff's depression, and/or anxiety, and/mobility impairments and/or migraines *and/if stress* affected a major life activity , such as working, under the FEHA.

227. Under the FEHA, A leave of absence and/or transfer can constitute a reasonable accommodation.

228. From around February 2018- November 2018, Plaintiff continuously requested "transfer," which is a reasonable accommodation under the FEHA.

229. From around September 2018-November 2018, Plaintiff continuously requested a "finite leave of absence" as a reasonable accommodation *See Atkins v. City of L.A.*, 8 Cal. App. 5th 696, 721-22 (2017).

230. Under the ADA and/or FEHA, Plaintiff was "qualified," as Plaintiff was and/or is able to perform the essential duties of the position with or without reasonable accommodation.

231. Def. Delta violated the FEHA as Def. Delta failed to provide a reasonable accommodation to Plaintiff, who has qualified disabilities, and Delta did not and can not demonstrate that Delta's failure to provide Plaintiff with a "leave of absence" and/or "transfer" in 2018 for her disabilities, would have imposed an "undue hardship," because Def. Delta gave a white female, Kimberly Ng, a transfer and a white female, Georgi, an extended leave of absence in or around 2018. *Atkins, 8 Cal. App. 5th at 733.* ("the duty to reasonably accommodate is an "affirmative" one that is "continuing" and "not exhausted by one effort." *Id.* (quoting *Humphrey, 239 F.3d at 1138*). Therefore, a "single failure to reasonably accommodate an employee may give rise to liability, despite other efforts at

THIRD  ˌ AMENDED VERIFIED COMPLAINT

accommodation." See Villalobos v. TWC Admin. LLC. 2017 U.S. App. LEXIS 26728 (9th Cir. 2017)

232.   Def. Delta and/or Def. Rangel failed to reasonably accommodate Plaintiff's reasonable accommodation requests at any time during her employment, from 10/2018 to 02/2021.

233.   Plaintiff was employed by Def. Delta Air Lines, Inc at LAX Airport in Los Angeles, CA during the period January 1, 2017-November 30, 2018, if not longer, thus entitling her to FEHA's protections.

234.   Plaintiff opposed and reported sex, race and disability discrimination and retaliation by Bernadette Komasi and/or Defendants Rangel and Tumpap, to Def. Delta's "EO" or Equal Opportunity Department in April 2019.

235.   In April 2019, Plaintiff opposed Manager /Supervisor Bernadette Komasi's constant sexual and racial harassing conduct as unwelcomed as Plaintiff reported to Delta's Equal Opportunity Department that she had "felt very uncomfortable around Komasi" because Komasi would always be sticking her tongue out and making sexual advances and sexual and racial comments about Plaintiff's black vagina and/or black vaginas."

236.   Beginning in early 2018, Plaintiff was not required under Title VII to take "further action" in opposition beyond Mayra Amezquita's witness complaint to Def. Rangel, about Komasi's unlawful racial and sexual harassment/discrimination directed at Plaintiff.

237.   Although Plaintiff did not file a written formal complaint regarding Komasi's sexual and racial discrimination and hostile work environment, Plaintiff did voice opposition to Def. Ashley Rangel in October 2018 and then again voiced opposition to Delta's Equal Opportunity Department in April 2019      about Komasi's unlawful activity which constituted protected opposition, when Delta's HR Manager specifically asked Plaintiff about Komasi's racial and sexual harassment and hostile work environment in April 2019 February 2021,

238.   After Plaintiff complained to her local HR Manager, Def. Rangel , in Sep 2018 about Komasi's sexual and racial harassment/discrimination and hostile work environment where Komasi , while not Plaintiff's direct supervisor/manager at time, made sexual demands upon Plaintiff from late 2017- 2018 when Komasi said to Plaintiff: "Show me your black kitty so I can pet her and make her purr," Def. Rangel threatened Plaintiff in October 2018 with more retaliation when Def. Rangel told plaintiff , "JoJo (Def. Tumpap) and I already took away your swapping benefits and shift bidding benefits, so just know that when employees file written complaints about being sexually harassed, Delta always takes away their travel benefits. You already experienced that when we left you stuck in Atlanta to warn you to shut your mouth and stop complaining about Bernadette Komasi's jokes. Only Men can be rapists and sexual harassers, Bernadette can't sexual harass you because she doesn't even have a cock. The only thing Bernadette can do is rub her carpet against yours, her vagina can't penetrate yours, so it's not sexual harassment. She can't fuck you. So stop being so dramatic, it's laughable and unbelievable. Delta doesn't like overly sensitive, loud, combative black drama queens. Do you want to be another unemployed, black welfare statistic? Don't ruin your career here because you cant handle compliments and jokes."

**AMENDED VERIFIED COMPLAINT**

239.   Aasir Azzarmi testified that after he reported in writing to his HR Manager , Bill Ittounas, and Corporate Director Tanya Morgan that Manager Cheval Morrison was "groping" him on regular basis, less than 2 months later , his material travel benefits were revoked and he received an adverse employment action of a FCAN, and when he complained again around January/February 2018, to Jennifer Zappia, Delta's General Manager of HR, he was terminated less than 2 weeks later.

240.   Because Aasir Azzarmi was terminated, in retaliation for opposing sexual harassment and sexual assault, Plaintiff did not want to personally report Komasi's sexual and racial harassment , as she did not want to be retaliated against, so Plaintiff told Mayra Amezquita to report what she witnessed to Delta's Los Angeles LAX airport, HR Manager, Def. Rangel,  so Def. Rangel, could investigate and/or prevent Komasi from continuing to sexually and racially harassed Plaintiff.

241.   Beginning in September 2018 and consistently through ⟨June⟩ 2021, Plaintiff communicated to                    Def. Delta a reasonable belief that she was the victim *of* unlawful employment practices.

242.   In early 2018, Def. Rangel, managing agent of Def. Delta Air Lines, Inc. was put on notice that Plaintiff was being sexually and racially harassed and/or stalked by Bernadette Komasi, when Mayra Amezquita personally notified Def. Rangel of the sexual and racial comments that Komasi, Delta's supervisor/manager, made to Plaintiff, that targeted Plaintiff because of her sex and race.

243.   In Plaintiffs administrative charge filed with  EEOC/FEHA in the July 2, 2019 charge , Plaintiff listed sex and disability discrimination and retaliation  in the July 2, 2019, where the events happened in "California, County of Los Angeles."

244.   In Plaintiffs administrative charge filed with  EEOC/FEHA in the February 23, 2021 charge , Plaintiff listed that she was harassed because of complainant's race, ancestry, national origin (includes language restrictions), color, sex/gender, gender identity or expression, sexual orientation, genetic information or characteristic, disability (physical or mental), medical condition (cancer or genetic characteristic), age (40 and over), other, sexual harassment- hostile environment, sexual harassment- quid pro quo, association with a member of a protected class.In Plaintiffs administrative charge filed with  EEOC/FEHA in the February 23, 2021 charge , Plaintiff listed that she was discriminated against because of complainant's race, ancestry, national origin (includes language restrictions), color, sex/gender, gender identity or expression, sexual orientation, genetic information or characteristic, disability (physical or mental), medical condition (cancer or genetic characteristic), age (40 and over), other, sexual harassment- hostile environment, sexual harassment- quid pro quo, association with a member of a protected class, family care or medical leave (cfra) and as a result of the discrimination was denied hire or promotion, reprimanded, asked impermissible non-job- related questions, denied the right to wear pants, denied any employment benefit or privilege, denied reasonable accommodation for a disability, other, denied work opportunities or assignments, denied or forced to transfer, denied family care or medical leave (cfra).".In Plaintiffs administrative _

THIRD                                    **AMENDED VERIFIED COMPLAINT**

1  charge filed with EEOC/FEHA in the February 23, 2021 charge , Plaintiff listed that she was
2  experienced retaliation because complainant reported or resisted any form of discrimination
   or harassment, requested or used a disability-related accommodation, participated as a
3  witness in a discrimination or harassment complaint, requested or used family care or medical
4  leave (cfra) and as a result was denied hire or promotion, reprimanded, asked impermissible
   non-job-related questions, denied the right to wear pants, denied any employment benefit or
5  privilege, denied reasonable accommodation for a disability, other, denied work opportunities
6  or assignments, denied or forced to transfer, denied family care or medical leave (cfra)."
7  245.   *As evidenced by Exhibit 8,* Stephanie Acosta testified that Def. Delta's HR Manager,
   Bill Ittounas, interfered with and/or restrained and/or chilled similarly situated Delta
8  employee's FMLA rights (Aasir Azzarmi) by telling him *"if you think about applying for
   FMLA, you will be fired."*
9  246.   It is an undisputed fact that Def. Delta did not start an investigation into Plaintiffs 2018,
10  2019, 2020 complaints of racial and sexual harassment/discrimination and sexually and
    racially hostile work environment and retaliation until after Plaintiff filed this lawsuit and/or
11  formal complaint
12  247.   Delta's HR Manager , David, Def. Delta, on February 17, 2021, left Plaintiff a
13  voicemail about the "investigation" he was beginning to conduct.
    248.   Title VII's anti-retaliation provision does not depend on who initiated the interview in
14  which the employee complained of unlawful conduct. The statutory touchstone is opposition,
15  not initiation.
    250.   On February 19, 2021, Def. Delta's HR Manager David told Plaintiff that Komasi's
16  racial and sexual harassment and discrimination against Plaintiff was never investigated by
17  Delta.
18  251.   Plaintiff reported to David in HR on 02/19/21 how at one time around April /May 2020,
    Komasi, while in her professional capacity as a Delta supervisor/manager, told Plaintiff "I'm
19  so horny Erika, I cant wait to fuck your black hole with my 10 x6 inch white cock strap on,"
20  as she repetitively and rapidly massaged her vagina, while staring at my breasts and crotch.
    252.   Plaintiff reported to David in HR on 02/19/21, in response to Def. Delta's initiation of
21  an investigation, that in 2020 when Plaintiff saw Bernadette Komasi in the workplace
22  Plaintiff tried to duck and hide from Komasi to avoid being sexually and racially harassed by
    Komasi but Bernadette Komasi ran up to Plaintiff and told Plaintiff, "you know I'm dying to
23  tear that black pussy up , but you like playing hard to get, I'm tired of chasing you and tired
24  of your games, you better stop running away from me before I beat you like a runaway slave.
    I require my lipsticks to be super submissive. I think you want me to spank that big black
25  booty before I eat it. I'm tempted to do it right now." As Plaintiff turned around and walked
26  away , Komasi spanked Plaintiff's "black booty." This time in 2020, however, Plaintiff didn't
    give any reaction or turn around but just kept walking away from Komasi because when
27  Plaintiff had previously turned down and opposed Komasi's sexual advances, Komasi
28  believed Plaintiff was just "playing hard to get."

THIRD         **AMENDED VERIFIED COMPLAINT**

253. On 02/19/2021, Plaintiff reported Komasi's mid 2020 sexual assault, where Komasi "spanked" Plaintiff's "black booty" to Delta's HR Manager, David on the telephone, after he left a voicemail for Plaintiff on 02/17/2021.

254. According to Delta's HR Manager, David, Def. Delta, on February 19, 2021, told Plaintiff on the telephone that he and/or Delta has finally initiated an investigation designed to detect discrimination prohibited by Title VII/FEHA regarding the sexual and racial harassment, sexual assault, retaliation and sex and race discrimination that Plaintiff previously complained about in 2018 and/or 2019 to to Defendants Rangel and Tumpap and/or Delta's Equal Opportunity Department.

255. From late 2017-mid 2020, Plaintiff was subjected to Komasi's verbal and physical conduct of a racial and sexual nature;

256. From late 2017-mid 2020, Bernadette Komasi's verbal and physical conduct of a racial and sexual nature conduct was unwelcomed by Plaintiff at all times

257. From late 2017-mid 2020, Bernadette Komasi's verbal and physical conduct of a racial and sexual nature severely and pervasively altered the conditions of the plaintiff's employment and created an abusive work environment.

258. From late 2017 through July 2021, Plaintiff, at all times, objectively and subjectively perceived herself to be working in a hostile work environment.

259. In 2018, Def. Rangel and Def. Tumpap's verbal and harassing conduct of a racial nature was unwelcomed by Plaintiff at all times.

260. In 2018, Plaintiff was constantly subjected to Def. Rangel and Def. Tumpap's verbal gender and racial comments, while employed at LAX airport, which polluted Plaintiff's work environment with insult and intimidation.

261. In 2018, Def. Rangel and Def. Tumpap's verbal gender and racial comments severely and pervasively altered the conditions of plaintiff's employment and created an abusive work environment.

262. Def. Delta ,once apprised of Komasi, Def. Rangel, and Def. Tumpap's discriminatory and harassing comments and/or behavior in 2018, based solely on Plaintiff's race and sex, failed to take adequate remedial and disciplinary action, even after Plaintiff made another complaint directly to Def. Delta's Equal Opportunity Department in April 2019.

263. *As evidenced by Exhibit 10*, Kelly Nabors, who is and/or was Delta's HR manager in Delta's Equal Opportunity Department, testified on behalf of Def. Delta that "we also conduct investigations throughout the company...to include things like workplace violence and harassment discrimination . And we try to again ensure that the company is following the correct policies and procedures, not just by the company that are laid out by Delta, but beyond, if necessary, ...we are not lawyers. But we try to ensure things that— again harassment, discrimination, those things that fall under equal opportunity as defined, if you will, by law, that is what we get involved in."

264. Less than 3 months after Plaintiff complained to Def. Rangel about being sexually and racially harassed by Komasi, Plaintiff's material pass travel benefits were temporarily suspended, causing Plaintiff economic harm. _____

**AMENDED VERIFIED COMPLAINT**

265.   Komasi, Def. Rangel, and Def. Tumpap's discriminatory and harassing behavior and comments and retaliation, which were based solely on Plaintiff's race and sex, was humiliating, embarrassing, dehumanizing, degrading, and exacerbated Plaintiff's depression and anxiety, lowered Plaintiff's self esteem, which made it difficult for Plaintiff to do her job, to take pride in her work, and made her not want to stay in her position any longer.

266.   Delta's failure to investigate was another act of retaliation against Plaintiff for engaging in protected activities.

267.   Employers, like Def. Delta Air Lines and/or Def. Rangel and/or Def. Tumpap, must conduct investigations to avoid liability under this Supreme Court's decisions in Faragher v. City of Boca Ra ton, 524 U.S. 775 (1998), Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), and Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999).

268.   Because Delta previously refused to investigate the illegal race and sex discrimination, which Plaintiff opposed to Def. Rangel in 2018 and/or to Delta's Equal Opportunity Department in April 2019, Def. Delta did not avoid liability prior to February 2021.

269.   Because Delta previously refused to investigate the illegal race and sex discrimination, which Plaintiff opposed to Def. Rangel in 2018 and/or to Delta's Equal Opportunity Department in April 2019, Def. Delta retaliated against Plaintiff by failing to investigate after put on notice, thereby intentionally subjecting Plaintiff to the severe sexually and racially hostile work environment that Plaintiff opposed.

270.   Plaintiff opposed and/or reported sex and disability discrimination and retaliation in the July 2, 2019 EEOC/FEHA charge.

271.   Although Bernadette Komasi was not Plaintiff's direct supervisor and/or direct manager from January 1, 2017-November 30, 2018, Bernadette Komasi, a Def. Delta supervisor/manager began sexually harassing Plaintiff around late 2017 with racially and sexually hostile comments, questions, flirting, winking , and sticking her tongue out at Plaintiff.

272.   On February 19, 2021, David from Delta's HR told Plaintiff that Def. Delta never previously investigated her complaints of sex, race , and disability discrimination and retaliation that Plaintiff made to Def. Rangel in 2018 and/or Delta's Equal Opportunity Department in April 2019.

273.   Around early 2018 , Mayra Amezquita was employed by Delta Air Lines Inc. as a Ready Reserve Agent at Los Angeles LAX Airport.

274.   Around early 2018, while Bernadette Komasi was in her professional capacity as supervisor/manager at Delta Air Lines, Mayra Amezquita , a Los Angeles LAX airport similarly situated Delta employee, heard Delta supervisor/manager Bernadette Komasi racially and sexually harass Plaintiff when Komasi said with a country African American accent, "your a sexy black bitch , Im gonna tear that black punani up, Make u have a seizure, like u caught the Holy Ghost. I wonder if your black cat tastes like some black soul food." While Komasi was saying "mmmmm Yum" and licking her lips."

275.   Around mid 2020, Bernadette Komasi, while she was in her professional capacity as supervisor/manager at Delta Air Lines, also told Plaintiff, "You must eat a lot of fried ____

THIRD                              AMENDED VERIFIED COMPLAINT

1   chicken, black pussy must like fried chicken, thats all you eat. I love greasy crunch fried
2   chicken, thats why Im dying to eat a black pussy like yours."
3   276. From early 2018 through mid 2020, Bernadette Komasi's conduct while she was in her
    professional capacity as supervisor/manager at Def. Delta Air Lines, was sufficiently severe
4   and pervasive to create a sexually and/or racially hostile work environment.
5   277. Beginning In early 2018, Def. Rangel and/or Def. Delta knew about Komasi's racial
    and sexual harassment and discrimination against Plaintiff because of her race and sex and
6   failed to take effective remedial action.
7   278.   In or around December 2018, Bernadette Komasi became Plaintiff's direct supervisor/
    manager, while Plaintiff was employed at Delta Air Lines, Inc.
8   279.   Had Def. Delta engaged in the interactive process and/or reasonably accommodated
9   Plaintiff's disabilities in October 2018, Plaintiff would not have been subjected to Bernadette
    Komasi's sexual and racial harassment, sexual assault and sexually and racially hostile work
10  environment, as Plaintiff's direct supervisor/manager, which began around December 2018.
11  280. But for Def. Delta's failure and refusal to engage in the interactive process and/or
    failure and refusal to reasonably accommodate Plaintiff's disabilities in October 2018,
12  Plaintiff would not have been subjected to Bernadette Komasi's constant sexual and racial
13  harassment, sexual assault and sexually and racially hostile work environment after
    December 2018, when Komasi became  Plaintiff's direct supervisor/manager.
14  281. At various times in the year of  2020, Bernadette Komasi who was no longer  Plaintiff's
15  direct supervisor/manager, continued racially and sexually harassing Plaintiff with
    Komasi's sexually and racially based comments about Plaintiff's black vagina everytime
16  Plaintiff saw Bernadette Komasi at Delta Air Lines, Inc. workplace, while Bernadette Komasi
17  was in her professional capacity as a Delta supervisor/manager .
    282. As evidenced by Mayra Amezquita's attached Declaration, Mayra Amezquita
18  witnessed Bernadette Komasi sexually harassing Plaintiff in early 2018.
19  283. Def. Delta made binding judicial admissions that "Delta offers its employees the benefit
    of additional flexibility in their work schedules by providing them with the opportunity to
20  swap shifts with each other under certain circumstances. (Divisional Practices Manual Swap
21  Policy ("Swap Policy"), attached as Exhibit 2 to Exhibit B." (see Case 2:16-cv-02979-RFB-
    GWF Document Filed 11/30/17 Page 6 of 18)
22  284.   Def. Delta made binding judicial admissions admits that "Failure to comply with swap
23  policy guidelines may result in disciplinary action, including the loss of swap privileges.
    (Swap Policy, Ex. B-2.)" (see Case 2:16-cv-02979-RFB-GWF Document Filed 11/30/17 Page
24  6 of 18.)
25  285.   Unlike similarly situated white female comparator, Sharon Lewis, Plaintiff Erika Lee
26  was never disciplined and/or accused of the "Failure to comply with swap policy guidelines
    may result in disciplinary action, including the loss of swap privileges." ("The Ninth Circuit
27  does not apply a rigid "same supervisor" requirement in determining whether employees are
28  similarly situated; employees who had different supervisors but who were subject to the same
    rules and standards may be similarly situated. *Earl v. Nielsen Media Research, Inc.* 658 F.3d

THIRD                        **AMENDED VERIFIED COMPLAINT**

1108, 1115 (9th Cir.2011); *see Hawn v. Executive Jet Mgmt., Inc., 615 F.3d 1151, 1157 (9th Cir.2010)*" see Koscis v. Delta Air Lines, Inc., 963, F. Supp. 2d 1002 (D.Hawaii, 2013))

286.  In October 2018, Defendants have never stated and/or explained any valid reason why Plaintiff's          swap privileges were suspended.

287.  But for Defendants suspension of Plaintiff's shift swapping privileges in October 2018,  Plaintiff would have been able to work enough hours to qualify for CFRA/FMLA leave in or around *Oct* ~~ober~~ 2019, *and/or November 30, 2019 and/or December 30, 2019*

288.  Defendants interfered with and/or restrained Plaintiff's exercising of her CFRA/ FMLA rights in both 2018 and/or 2019 by suspending Plaintiff's shift swapping privileges in Oct. 2018 *and/or denying Plaintiff's swap requests to pick up hours from October 2018 - March 30, 2020*

289.  Defendant Delta had no valid reason for suspending Plaintiff's swap shift privileges in October 2018 *and/or November 2018 and/or any time from october 2018 through March 30, 2020.*

290.  Plaintiff told Def. Rangel in 2018, while she was on a medical leave, that Plaintiff started getting migraines and would need intermittent FMLA/CFRA leave when she returned back to work.

291.  Defendants suspension of Plaintiff's shift swapping privileges in October *November/* 2018 interfered and/or restrained Plaintiff's exercising of her FMLA rights in September *December/November* October 2019.

292.  After Defendants were informed by Plaintiff that she had a serious medical condition, migraines, that qualified for CFRA/ FMLA leave before October 2018, Defendants interfered and/or restrained Plaintiff's exercise of her CFRA/FMLA rights by suspending Plaintiff's swap shift privileges in or around October 2018, after she returned from another medical leave.

293.  Plaintiff was entitled to to leave under the CFRA/ FMLA for her serious medical condition of migraines in or around October 2018 and/or in or around October 2019 *and/or Nov 2019 and/or Dec. 2019*

294.  Plaintiff provided sufficient notice, more than 30 days-notice, of her intent to take intermittent CFRA/FMLA leave before September 2018 and then again in October 2018 and/ or October 2019.

295.  Plaintiff was eligible *or would've been eligible* for the CFRA/FMLA's protections in October 2018 and/or October 2019 *and/or November 2019 and/or December 2019, had Def. Delta not interferred with Plaintiff's FMLA rights.*

296.  Def. Delta , Plaintiff's employer, was covered by the CFRA/FMLA from 2006-2021.

297.  Def. Delta , Plaintiff's employer denied Plaintiff FMLA/CFRA benefits to which she was entitled in October 2018 and/or October 2019 *and/or November 2019 and/or December 2019.*

298.  Defendants willful conduct of suspending Plaintiff's swap shift privileges in October 2018 unequivocally interfered with Plaintiff's exercise of her rights under the FMLA/CFRA in October 2018.

299.  In October 2018, Def. Delta willfully violated the FMLA/CFRA when it suspended Plaintiff's seniority shift bidding privileges and/or swap shift privileges to deprive her of the chance to work sufficient hours to remain FMLA eligible, thus interfering with her ability to receive and take FMLA leave beginning around October/November 2019 *and/or December (30) 2019.*

300.  Plaintiff worked for a Def. Delta, a CFRA/FMLA covered employer for over 12 months.

*THIRD*          AMENDED VERIFIED COMPLAINT

301. Around January 2018, Plaintiff had began getting migraines due to the stress that exacerbated her disabilities of anxiety and depression and stress.

302. Sharon Lewis, a similarly situated white female comparator, was approved for intermittent FMLA for "headaches" by Def. Delta.

303. Before October 2018, Def. Ashley Rangel, a white woman, was informed that Plaintiff, an African American women, was seeking intermittent FMLA leave for migraines.

304. In October 2018, Def. Ashley Rangel told Plaintiff " Delta will not approve your FMLA for migraines. Your Migraines are not a serious medial condition that qualifies you for intermittent leave under the FMLA."

305. Because of Plaintiff's African American race, Defendants interfered with Plaintiff's rights under the FMLA by not allowing Plaintiff, to take intermittent FMLA leave but allowed and approved Sharon Lewis, a similarly situated white female comparator, to take and use intermittent FMLA for "headaches."

306. Section 825.113 (d) of the FMLA regulations make a distinction between ordinary "headaches", which do not qualify as a serious health condition under the FMLA, and migraines, which qualify as a serious health condition, "headaches other than migraine."

307. In 2018, 2021 Plaintiff suffered adverse employment actions and/or revocations of material benefits and/or harassment by Def. Rangel and/or Def. Tumpap, because of her disability.

308. In 2018, Def. Tumpap denied Plaintiff the right to wear pants, after Plaintiff asked how she can be promoted within the company, as Def. Tumpap told Plaintiff that if Plaintiff wanted to be promoted and/or to find another job position for higher pay at Delta, he wanted her to wear a skirt and heels to look "sexy," even though Plaintiff had a physical mobility impairment.

309. Plaintiff has a qualifying disability under the ADA.

310. In 2018 and/or 2019 and/or 2020 2021 , Defendants discriminated against Plaintiff's disabilities by failing to provide a reasonable accommodation (chair).

311. Before October 2018 and/or in October 2018, Defendant Delta received adequate notice that Plaintiff had a disability. (Obesity and/or back injury and/or mobility impairment)

312. Before October 2018 and/or in October 2018, Defendant Delta and/or Defendant Rangel received adequate notice that Plaintiff requested a reasonable accommodation.

313. Although Def. Delta and/or Defendant Rangel were aware that Plaintiff requested a reasonable accommodation in October 2018 and/or November 2018, they failed to engage in the interactive process at any time from October 2018 through April 2019, before Def. Delta denied Plaintiff's reasonable accommodation without ever engaging in a TIMELY, good faith interactive process.

314. Around the end of 2018 and/or early 2019, Def. Delta and/or Defendant Rangel granted Kimberly Ng's transfer to another airport.

315. Around the end of 2018 and/or early 2019, the granting of Kimberly Ng's transfer to another airport, by Def. Delta and/or Def. Rangel, did not place an undue hardship on the operation of the Delta's business.

THIRD                                    AMENDED VERIFIED COMPLAINT

316.   Around 2018, the granting of Georgi's leave of absence, by Def. Delta and/or Def. Rangel, did not place an undue hardship on the operation of the Delta's business.

317.   Around the end of 2018 and/or early 2019, plaintiff was never given a transfer by Def. Delta, after Plaintiff requested a reasonably accommodation. of a transfer.

318.   Around the end of 2018 and/or early 2019, Plaintiff's reasonable accommodation request of a transfer did not place an undue hardship on the operation of the Delta's business.

319.   At no time from February 2018- June, 2021, did Def. Delta and/or Defendant Rangel tell Plaintiff that a transfer would have placed an undue hardship on the operation of the Delta's business.

320.   At no time from October 2018- June, 2021, did Def. Delta and/or Def. Rangel ever conduct a good faith formal interactive process to identify or explore options for accommodating Plaintiff's reasonable accommodation requests (transfer, leave of absence Chair) after Plaintiff made various reasonable accommodation requests, verbally and via email, to Def. Rangel and/or Def. Delta's Equal Opportunity Dept. in 2018.

321.   A transfer as the reasonable accommodation that Plaintiff requested several times in 2018, including October 2018 and/or Nov. 2018, would have been possible for Plaintiff in December 2018 and/or January 2019, as Def. Delta and/or Def. Rangel, around the end of 2018 and/or early 2019, granted Kimberly Ng, who is a similarly situated white female comparator, a transfer to another airport.

322.   Before November 5, 2018 and/or in October 2018, Defendant Delta received adequate notice that Plaintiff requested a reasonable accommodation of a transfer and/or leave of absence and/or extended leave of absence.

333.   Plaintiff's September/October 2018 requests for intermittent FMLA/CFRA days off was protected activity under the FMLA / CFRA.

334.   Def. Delta and/or Def. Rangel knew that Plaintiff was exercising her rights under the FMLA in September and/or October 2018.

335.   After Def. Delta and/or Def. Rangel learned that Plaintiff was exercising her FMLA rights, Def. Delta took adverse employment actions against Plaintiff by taking away material pass travel benefits, shift swapping benefits, seniority shift benefits and/or ability to make more income by picking up more hours and took away Plaintiff's shift swapping benefits to prevent Plaintiff from further exercising her FMLA rights in 2019.

336.   Not only was there was a causal connection based on timing between the protected FMLA activity that Plaintiff engaged in and the adverse employment actions take Def. Delta took against Plaintiff, but Def. Delta specifically took away Plaintiff's swapping benefits to ensure Plaintiff would not be able to make 1250 hours in 2019 to qualify for FMLA the following year.

335.   Plaintiff lost wages of around $2-3,000.00 as a result of Defendants willful interference into Plaintiff's exercise of her FMLA rights in violation of 29 U.S.C. § 2617. (LOST WAGES CLAIM UNDER THE FMLA)

336.   Because Defendant Delta intentionally and willfully interfered with Plaintiff's FMLA rights when it revoked Plaintiff's swapping benefits                    for the sole purpose of

**AMENDED VERIFIED COMPLAINT**

1  preventing Plaintiff from picking up hours to qualify for                    FMLA leave,
2  Plaintiff was denied the opportunity to earn income and thus lost wages in violation of 29
   U.S.C. § 2617, *beginning in October 2018 through March 30, 2021*
3  337.  But for Defendant Delta's suspension of Plaintiff's swapping benefits to willfully
4  interfere with Plaintiff's FMLA rights, Plaintiff would not have lost wages of around
   $2-3,000.00, in violation of 29 U.S.C. § 2617, which was an impairment of Plaintiff's Ready
5  Reserve employment contract, *in October 2018, November 2018, December 2018, q April 2019*
6  338.  In or around 2018 and/or before 2018, Def. Delta and/or Defendants were put on "fair
   notice," that plaintiff had filed a complaint under the FLSA and/or California Labor laws
7  when Plaintiff was a class member of around 3 class action lawsuits in violation of California
8  wage and hour laws.
9  339.  Because of Plaintiff's race, Defendant Delta and/or Def. Rangel and/or Def. Tumpap
   impaired Plaintiff's Ready Reserve employment contract by suspending her shift swapping
10 privileges, pass travel benefits, seniority shift bidding privileges and FMLA rights for no
   valid reason in violation of 42 USC 1981.
11 340.  Because Sharon Lewis is a similarly situated white female, Defendant Delta and/or
12 Def. Rangel and/or Def. Tumpap **only suspended Sharon Lewis' shift swapping privileges**
   when Sharon Lewis allegedly violated Def. Delta's shift swapping policy.
13 341. Because Sharon Lewis is a similarly situated white female, Def. Delta allowed Sharon
14 Lewis to take intermittent FMLA leave for "headaches," which isn't considered a serious
15 medical condition under the FMLA, but didn't allow Plaintiff to take intermittent FMLA
   leave for her "headaches" and/or migraines.
16 342.  After Plaintiff alerted Def. Rangel and/or Def. Delta of her desire to take FMLA/CFRA
17 leave for a reason that would qualify under the FMLA/CFRA, Delta did not obtain any
   additional required information through informal means. See 29 C.F.R. § 825.303(b).
18 343.  Because Def. Delta and/or Def. Rangel simply denied Plaintiff intermittent FMLA/
19 CFRA leave when she stated in September/ October 2018 "it's our local Los Angeles Delta
20 policy that you can't ask for any days off, that's the bottom line,Defendants Delta and/or
   Rangel did not ask Plaintiff for any additional required information during this "informal"
21 process, and Plaintiff was never expected and/or allowed to "provide more information."
22 344.  Around September/ October 2018, Def. Delta and/or Def. Rangel knew FMLA/CFRA
   leave was being sought by Plaintiff.
23 345.  From September 2018 - November 30, 2018, Def. Delta never obtained the necessary
24 details of the FMLA/CFRA leave to be taken as Def. Rangel repeated to Plaintiff in October
   on several occasions *"it's our local Los Angeles Delta policy that you can't ask for any days*
25 *off, that's the bottom line."*
26 346.  Because it is undisputed that Plaintiff took previously approved FMLA leaves before
   October 2018, Def. Delta and/or Def. Rangel were therefore placed on notice in October 2018
27 that the leave Plaintiff was seeking might be covered by the FMLA.
28 347. Because Def. Delta and/or Def. Rangel received a doctor's note from Plaintiff around
   September/October 2018, Def. Delta and/or Def. Rangel were therefore placed on notice __

                              THIRD  **AMENDED VERIFIED COMPLAINT**

1  around September/ October 2018 that the leave Plaintiff was seeking in 2018 might be
covered by the FMLA.
2  348. After Plaintiff provided Def. Delta and/or Def. Rangel with a doctor's note around
3  September/October 2018, Def. Delta and/or Def. Rangel never inquired further to determine
4  whether the intermittent leave and/or days off that Plaintiff was asking for were likely to
qualify for FMLA/CFRA protection. Cf. Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112,
5  1130–31 (9th Cir. 2001) Escriba v. Foster Poultry Farms, Inc., 743 F.3d 1236 (9th Cir. 2014)
6  349.   Def. Delta and/or Def. Rangel, a Los Angeles HR Manager for Delta Air Lines Inc.,
willfully and intentionally interfered with and/or restrained Plaintiff's Rights under the
7  FMLA in October 2019 by Def. Rangel and/or Def. Delta's deliberate revocation of *Nov DEC 19*
8  Plaintiff's shift swapping privileges in October 2018 and/or late 2018 in an attempt to prevent
9  Plaintiff from making the required 1250 hours for Plaintiff to qualify to exercise her rights
under the FMLA in October 2019, *November 2019, and December 2019.*
10  350.   Def. Delta has a willful pattern and practice of revoking shift swapping benefits of
11  Ready Reserve employees immediately after Def. Delta has become aware and/or is on notice
that a similarly situated Ready Reserve employee, like Erika Lee and/or Sharon Lewis, has a
12  serious medical condition that qualifies for the FMLA's protection.
13  351.   The 9th circuit (JOSEPH LEWIS V. DELTA AIR LINES, INC., No. 18-16911 (9th Cir.
2020) affirmed the Nevada jury's **unanimous verdict in** 2:14-cv-01683-RFB-
14  GWF **that** found Delta guilty of both failing to accommodate the HIV protected disability of
15  former Delta employee Joseph Lewis and terminating Joseph Lewis on account of his
disability.
16      . The Nevada jury unanimously found Delta's actions were willful
17  and reckless, and awarded punitive damages. On appellate review of the jury verdict, the 9th
18  circuit found *"The evidence overwhelmingly established that Delta terminated Lewis due to
those absences, including testimony from Lewis's supervisor that he would not have
19  recommended Lewis's termination but for those absences."*   *(obesity)*
20  352. Plaintiff told Def. Rangel around February/March 2018 that she was disabled and had a
mobility impairment.
21  353. Plaintiff told Def. Rangel around February/March 2018 that she had depression and *stress and*
22  anxiety and that she started getting migraines and headaches due to the extreme stress she had
of being displaced and/or being in a temporary state of homelessness, which were
23  exacerbating her disabilities of depression and anxiety.
24  354.   In October 2018, Plaintiff told Def. Rangel again that these migraine headaches
affected working, which is a major life activity.
25  355.   Def. Delta violated FMLA by interfering with, restraining, and/or denying  Plaintiff's
26  exercise  of  FMLA  rights in October 2018 and/or October 2019 *and/or November 2019 and/or December 2019*
356.   Based on Information and belief, Delta processed Plaintiff's previous 2018 medical
27  leave as a paid short term disability leave.
28  357. Upon information and belief, Plaintiff had paid personal time days off in her bank in
October 2018. _____

*THIRD*                      **AMENDED VERIFIED COMPLAINT**

358.  Because Def. Delta did not restore Plaintiff to the same position with the same material benefits and/or privileges after she returned from her FMLA in 2018 , Delta chilled Plaintiff's freedom to exercise her FMLA rights.

359.  After Plaintiff returned from an FMLA and/or paid disability *and hr unpaid* leave in 2018, Plaintiff attempted to exercise her rights under the FMLA/CFRA in October 2018 when she requested intermittent FMLA/CFRA leave, to which she was entitled.

360.  After Plaintiff exercised her rights under the FMLA/CFRA again in October 2018 , Defendant Rangel explicitly told Plaintiff that she was forbidden from asking for more days off, even though Plaintiff was entitled to FMLA/CFRA leave.

361.  Def. Delta's FMLA/CFRA violation was willful because Def. Delta later revoked the local Los Angeles LAX airport FMLA/CFRA policy that was only in place at Los Angeles LAX Airport but not in place at other Def. Delta stations.

362.  Upon information and belief, Def. Rangel, Delta's HR Manager at Los Angeles Airport, arbitrarily implemented this local Los Angeles LAX airport FMLA/CFRA policy that Def. Delta later revoked, as it willfully violated Plaintiff's and/or other employees' rights under the FMLA/CFRA.

363.  Def. Delta's FMLA violation was willful because after Plaintiff complained in 2018 that Deltas Los Angeles LAX FMLA/CFRA policy violated the FMLA/CFRA and wasn't applied to other similarly situated employees in other stations in other states, Delta admittedly abolished its Los Angeles LAX airport FMLA/CFRA policy that only applied to Def. Delta employees at LAX airport in Department 125, which was managed by Defs. Rangel and Tumpap           .. 29 U.S.C. § 2617(c)(2)

364. *In October 2018,* Defendants, all of them ,were personally aware that their willful conduct and/or employment of local arbitrary policies, whereby Defendants told Plaintiff and other similarly situated colleagues that they couldn't take days off, intentionally  violated the FMLA/CFRA.

365.  In 2018, Defendants, all of them, showed a reckless disregard of Plaintiff's FMLA rights and/or Delta's similarly situated Los Angeles Airport colleagues' FMLA rights by explicitly prohibiting them from taking any take days off.

366.  Def. Rangel interfered with Plaintiffs rights under the FMLA/CFRA when she threatened Plaintiff and /or other employees such as Mayra Amezquita with termination if they asked for a reasonable accommodation or to exercise their rights under the FMLA/CFRA.

367. After Plaintiff exercised her rights under the FMLA/CFRA, Def. Rangel and Def. Tumpap constantly harassed Plaintiff and took away her material pass travel benefits, shift swapping benefits, and her ability to bid for a shift, to chill Plaintiff from exercising her rights under the FMLA/CFRA.

368.  Def. Rangel and Def. Tumpap interfered with Plaintiffs rights under the FMLA  and impaired her employment contract with Delta by suspending her swapping privileges to prevent her from being able to work sufficient hours to become eligible for intermittent FMLA leave in October 2019, *November 2019, December 29, 2019 ; and January 2020, & February 2020 and  March 30, 2020.*

**AMENDED VERIFIED COMPLAINT**

369. Because of Plaintiff's race, Def. Rangel and Def. Tumpap Impaired Plaintiffs employment contract with Delta by suspending her swapping privileges to prevent her from making income.

370. Plaintiff and /or other Delta employees such as Mayra Amezquita, Aasir Azzarmi, Stephanie Acosta, Sharon Lewis, Joseph Lewis all expected to be terminated for exercising their rights under the FMLA, based on the threats, hostility, interference and retaliation of Def. Delta's HR Managers, such as Bill Ittounas, Jennifer Zappia, Lisa Todd, and/or Ashley Rangel.

371. March 30, 2024 was the date of the last event constituting the alleged FMLA/CFRA violation for which this action is brought.  29 U.S.C. § 2617(c)(1)

372. *As evidenced by Exhibit 9,* Aasir Azzarmi testified and has admissible authenticated evidence that William Ittounas and Def. Delta's in house attorney, Sheandra Clark, were attempting to terminate him, without any valid reason and/or any violation of company policy, less than 2 months, after he exercised his rights under the FMLA.

374. Defendant Delta's failure to investigate Plaintiff's complaints of retaliation, sex and race and disability discrimination by Defendants Rangel and Tumpap , sexual and racial harassment by Bernadette Komasi, failure to engage in the interactive process and/or failure to reasonably accommodate Plaintiff's disabilities , impairment of her employment contract, willful interference of her exercising of her FMLA rights and retaliation for exercising her rights under the FMLA are a "continuing violations," beginning in early 2018 and repeating itself until around 2021.    See United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977);

375.  Plaintiff's February 23, 2021 Title VII/ADA/FEHA charge, where Defs. failed to investigate Plaintiff's previous complaints of sex/race/disability/retaliation/FMLA/CFRA violations constitute a retaliatory adverse action.  Compare Rochon v. Gonzales, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006) (FBI's failure to investigate discriminatory and retaliatory death threat made against employee and his family constituted retaliatory adverse action because FBI would have investigated in other circumstances and its failure to do so here might well have dissuaded reasonable employee from complaining of discrimination) (*cited with approval in Burlington N., 548 U.S. at 63-64); McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1117 (9th Cir. 2004).*Courts have held that an employer's failure to conduct a proper investigation can itself be evidence of a pretext.. (See, e.g., Nazir v. United Airlines, Inc. (2009) 178 Cal.App.4th 243, 277, 280; Mendoza v. Western Medical Center Santa Ana (2014) 222 Cal.App.4th 1334, 1344-45). See, e.g., Serri v. Santa Clara Univ. (2014) 226 Cal.App.4th 830, 873); Yanowitz v. L'Oreal USA, Inc. (2005) 36 Cal.4th 1028, 1035. that "[i]f a defendant employer hopes to prevail by showing that it investigated an employee's complaint and took action appropriate to the findings of the investigation, then it will have put the adequacy of the investigation directly at issue, and cannot stand on the attorney-client privilege or work product doctrine to preclude a thorough examination of its adequacy" in discovery. Wellpoint Health Networks, Inc. v. Superior Court (1997) 59 Cal.App.4th 110, 128. Thus, an employer who wants to rely on this defense will need to produce investigative

 **AMENDED VERIFIED COMPLAINT**

1  documents, even if the investigation was undertaken by legal counsel. Otherwise, the
2  employer will not be able to use evidence about the investigation at trial. Cotran v. Rollins
   Hudig Hall International, Inc. (1998) 17 Cal.4th 93. Cases following Cotran have refined the
3  requirements for an "adequate investigation" in the employment context. In Silva v. Lucky
4  Stores, Inc. (1998) 65 Cal.App.4th 256.See Little, 301 F.3d at 967 ("The nature of Little's
   employment extended the work environment beyond the physical confines of the corporate
5  office.") Little v. Windermere Relocation, Inc., 301 F.3d 958, 968 (9th Cir. 2002).
6  376. As evidenced by Exhibit 7, Def. Delta instructs its managers and/or HR managers like
   Def. Rangel and Def. Tumpap, that "just because the employee uses the terms 'harassment'
7  or 'discrimination' or alleges 'unfair treatment' a full-scale investigation is not necessarily
8  required… Not all issues require a full scale internal investigation. Often concerns can be
   easily resolved without a full investigation."
9  377. Exhibit 7 is a true and correct copy of Def. Delta's policy on "Planning the
10 Investigation." This is a self-authenticating document, as it has DELTA company logo on it
   and it is Delta BATES Stamped as "D-4987," "D-5001" and "D-5002" and was provided by
11 Def. Delta's attorney in the course of discovery in Case 2:14-cv-01683-RFB-GWF. These are
12 not hearsay statements/exhibits, as they were offered by Def. Delta Air Lines, Inc.'s agent
13 against Def. Delta.
14 378. As evidenced by Exhibit 6, when Joanne Guerrant, Def. Delta's Equal Opportunity
   manager, was asked "So if an HR person learns—and they are one of the first people at Delta
15 to learn that someone's disabled and has an accommodation request, its their responsibility to
   get it to the attention of EO…" and Joanne Guerrant, Def. Delta's Equal Opportunity
16 manager, testified, "thats correct."
17 379. Exhibit 6 is a true and correct copy of Joanne Guerrant, Def. Delta's Equal Opportunity
   manager's testimony in Case 2:14-cv-01683-RFB-GWF. Because Plaintiff obtained this
18 deposition from PACER, a government website. This is a judicially noticeable and
19 authenticated document as Def. Delta's attorney's conducted the deposition and Joanne
   Guerrant is a Delta agent. These are not hearsay statements/exhibits, as they were offered by
20 Def. Delta Air Lines, Inc.'s agent against Def. Delta.
21 380. Exhibit 10 is a true and correct copy of Kelly Nabors, Def. Delta's Equal Opportunity
22 manager's testimony in Case 2:14-cv-01683-RFB-GWF. Because Plaintiff personally
   obtained this deposition from PACER, a government website, this is a self authenticating
23 document. This is a judicially noticeable and authenticated document as Def. Delta's
24 attorney's conducted the deposition and Kelly Nabors is a Delta agent. These are not hearsay
   statements/exhibits, as they were offered by Def. Delta Air Lines, Inc.'s agent against Def.
25 Delta.
26 381. As evidenced by Exhibit 5, Lisa Todd, Delta's HR Manager , when asked why she
   herself did not start the "interactive process with Mr. Lewis," she testified, "He did not ask
27 for an accommodation."
28

THIRD                              **AMENDED VERIFIED COMPLAINT**

382. Plaintiff testifies that Def. Rangel, as the local Delta HR Manager, is responsible for initiating the interactive process, once she is on notice that a Los Angeles LAX airport employee sends her a reasonable accommodation request via email, as Plaintiff did in 2018.

383. Exhibit 5 is a true and correct copy of Lisa Todd, Def. Delta's HR Manager's testimony in Case 2:14-cv-01683-RFB-GWF. Because Plaintiff personally obtained this deposition from PACER, a government website, this is a self authenticating document. This is a judicially noticeable and authenticated document as Def. Delta's attorney's conducted the deposition and Lisa Todd is a Delta agent. These are not hearsay statements/exhibits, as they were offered by Def. Delta Air Lines, Inc.'s agent against Def. Delta.

384. As evidenced by Exhibit 5, Lisa Todd, Delta's HR Manager, is aware that a leave and/or an extended leave of absence is a reasonable accommodation.

385. Exhibit 11 is a true and correct copy of Jonathan Blackwell, Def. Delta's Managing agent's Declaration/testimony in Case 2:16-cv-02979-RFB-GWF. Because Plaintiff personally obtained this deposition from PACER, a government website, this is a self authenticating document. This is a judicially noticeable and authenticated document as Def. Delta's attorney's offered this document in support of Summary Judgment against the Plaintiff Sharon Lewis. Jonathan Blackwell is a Delta agent. These are not hearsay statements/exhibits, as they were offered by Def. Delta Air Lines, Inc.'s attorney/agent against Plaintiff Sharon Lewis. These are binding judicial admissions.

386. Exhibit 12 is a true and correct copy of Sharon Lewis' Deposition testimony in Case 2:14-cv-01683-RFB-GWF. Because Plaintiff personally obtained this deposition from PACER, a government website, this is a self authenticating document. This is a judicially noticeable and authenticated document as Def. Delta's attorney. Suzanne Martin, authenticated this Deposition transcript on "30th day of November 2017," as she personally conducted the deposition and filed a Declaration, under the penalty of perjury, that these are *true and correct copies of pages from the transcript of the deposition of Plaintiff Sharon Lewis taken on September 14, 2017, which pages have been authenticated by the Certificate of Reporter.*". These are not hearsay statements/exhibits, as they were offered and personally authenticated by Def. Delta Air Lines, Inc.'s attorney, agent, acting on behalf of Def. Delta. This are binding judicial admission and admissible authenticated evidence.

387. Exhibit 14 is a true and correct copy of Def. Delta's "Swap Policy." Plaintiff has personal knowledge of this Delta document as she has seen it on Delta's website during the Course of her employment with Delta Air Lines. Michelle Harris authenticated this document in her attached declaration in Case 2:14-cv-01683-RFB-GWF.. These are not hearsay statements/exhibits, as they were offered and personally authenticated by Def. Delta Air Lines, Inc.'s agent, acting on behalf of Def. Delta.

388. Exhibit 3 is a true and correct copy of Def. Delta's "FMLA Policy." Plaintiff has personal knowledge of this Delta document as she has seen it on Delta's website during the Course of her employment with Delta Air Lines. Michelle Harris authenticated this document in her attached declaration(see Exhibit 14) in Case 2:14-cv-01683-RFB-GWF.. These are not

THIRD     **AMENDED VERIFIED COMPLAINT**

1  hearsay statements/exhibits, as they were offered and personally authenticated by Def. Delta

2  Air Lines, Inc.'s agent, acting on behalf of Def. Delta.

   389. Exhibit 1 is a true and correct copt of the email communications I have personally

3  received from Def. Delta and/or its managing agents in 2018 and/or Def. Rangel and/or Def.

4  Tumpap and/or Melissa Chapman and/or Wes regarding the claim in this complaint, including

   promotion (1981), reasonable accommodation, opposition to the discrimination (race and sex

5  and disability), violations of CFRA/FMLA ( interference and retaliation), failure to interact

6  and/or failure to reasonably accommodate Plaintiff's disabilities (FEHA, ADA, etc.)

   violations of California State labor laws, etc. I have personally knowledge of these emails

7  because I was the recipient and/or the sender of these emails, during the course of my

8  employment, to Def. Delta and/or its managing agents and these emails were sent on my

   personal email and/or my Delta email account, erika.l.lee@delta.com.

9  390. Exhibit 2 is a true and correct copt of the email communications I have personally

10 received from Def. Delta and/or its managing agents in 2018 and/or Def. Rangel and/or Def.

   Tumpap and/or Melissa Chapman and/or Wes regarding the claim in this complaint, including

11 promotion (1981), reasonable accommodation, opposition to the discrimination (race and sex

12 and disability), violations of CFRA/FMLA ( interference and retaliation), failure to interact

13 and/or failure to reasonably accommodate Plaintiff's disabilities (FEHA, ADA, etc.)

   violations of California State labor laws, etc. I have personally knowledge of these emails

14 because I was the recipient and/or the sender of these emails, during the course of my

15 employment, to Def. Delta and/or its managing agents and these emails were sent on my

   personal email and/or my Delta email account, erika.l.lee@delta.com.

16 391. Exhibit 27 is a true and correct copy of the pictures that my colleague, Babji

17 Adams took at Delta's ATL airport of similarly situated CSA's in Dept. 125, who are

18 not disabled, using chairs while performing the essential elements of their job.

19 Babji Adams told Plaintiff in June 2021 that she personally took these

20 photos with her cell phone and asked these similarly situated Delta employees

21 it they were disabled and they said, "No." Babji Adams will write a Declaration

22 and testify.

23 392. Plaintiff was not able to pick up any hours in October 2019.

24 393. Plaintiff was not able to pick up any hours in November 2019.

25 394. Plaintiff was not able to pick up any hours in December 2019.

26

27 395. Exhibit 29 is a true and correct copy of my June 8, 2021 reasonable

28 accommodation requests and my April 2, 2021 reasonable accommodation requests.

THIRD          **AMENDED VERIFIED COMPLAINT**

396.     Attached hereto as Exhibit 28 is a true and correct copy of the 03/26/2021 Suspension letter that Def. Delta Air Lines, Inc. sent via Fedex to Los Angeles, California residents **Ashley and Evan,** who reside at 13163 Fountain Park Dr. B417, Playa Vista, CA, 90094, who then gave it to **Southwest Airlines employee, Mayra Amezquita,** who then gave it to Plaintiff Erika Lee.. (see Declaration of Mayra Amezquita).

397.     As evidenced by Exhibit 28, Def. Delta    published to third parties, an unprivileged, statement of purported fact that Plaintiff engaged in some sort of *"dishonest behavior," in Def. Delta's March 26, 2021 "Suspension Letter" for "Conduct", which was authored by Delta's HR Manager Danielle Kruit, but Def. Delta withheld the facts which formed the basis of Plaintiff's "dishonest behavior."*

**398.**     As evidenced by Exhibit 28, Def. Delta    published to third parties, an unprivileged, statement of purported fact that Plaintiff engaged in some sort of "dishonest behavior," in Def. Delta's  March 26, 2021 "Suspension Letter" for "Conduct", which was authored by Delta's HR Manager Danielle Kruit, but Def. Delta withheld the facts which formed the basis of Plaintiff's "dishonest behavior," attempting to imply to third parties that Plaintiff is "dishonest" and/or unscrupulous and/or a liar and/or that Plaintiff lacks professional integrity and/or that Plaintiff committed some type of criminal and/or immoral act.

399.     *Because of Defendant Delta and/or Def. Delta's managing agents and employees'* ***publishing*** *unprivileged, libelous and slanderous per se statements of purported facts of and concerning and/or about  Plaintiff to third parties that Plaintiff is "a liar" and/or "a fraud," who "committed workers compensation fraud," and/or that Plaintiff was "dishonest" and/or that Plaintiff engaged in "dishonest behavior," Plaintiff has special damages, including but* ~~not limited to loss of income from May 1, 2021 through June 9, 2021,~~ *loss of non-rev pass travel benefits causing Plaintiff to purchase revenue airline ticket/s at full fair price, loss of health insurance benefits, profit sharing, loss of 401k, loss of PPT/vacation time, loss of earned free confirmed anywhere in the world tickets Plaintiff was given by Def. Delta., etc.*

400.     *I*n or around February 2021 through June 8, 2021, Def. Delta, by and through its employees and/or managing agents, Danielle Kruit and/or Richard Lorich and/or David ___

**THIRD AMENDED VERIFIED COMPLAINT FOR DAMAGES**

1   Needham, published unprivileged, libelous and slanderous per se statements of purported

2   facts of and concerning and/or about  Plaintiff to third parties that Plaintiff is *"a liar"* and *"a*

3   *fraud,"  who "committed workers compensation fraud," that Plaintiff* is̶ *was "dishonest" and/*

4   *or committed "dishonest behavior."*

5   **401.   At all times,** Def. Delta's published unprivileged, libelous and slanderous per se

6   statements of purported facts about Plaintiff to third parties, Richard Lorich, Evan and

7   Ashley, Mayra Amezquita, Datev, and Kristal Johnson that Plaintiff is *"a liar" and "a fraud,"*

8   *who "committed workers compensation fraud," that Plaintiff* ̶was *"dishonest" and/or*

9   *committed "dishonest conduct" are all* <u>*100% false.*</u>

10   402.   Plaintiff received Def. Delta's Suspension letter, attached hereto as Exhibit 28, from

11   Mayra Amezquita, a Los Angeles, California resident, who is employed at Southwest Airlines

12   at Los Angeles LAX International airport, in or around the beginning of April 2021.

13   403.   In February 2021, Def. Delta's HR Manager David Needham published and/or

14   republished Delta HR Manager Danielle Kruit's previously unprivileged, false, defamatory

15   per se statements of purported facts about Plaintiff to Plaintiff that *"Erika Lee is a liar and a*

16   *fraud, who was never sexually harassed and sexually assaulted by Bernadette Komasi, and*

17   *Delta has intel that Erika committed workers compensation fraud because she never hurt*

18   *her back at LAX airport."*

19   404.   Sometime before the end of February 2021, Def. Delta and/or Delta's managing agent,

20   Danielle Kruit published and/or republished unprivileged, false, defamatory per se statements

21   of purported facts about Plaintiff to Def. Delta's HR Manager David Needham that *"Erika*

22   *Lee is a liar and a fraud, who was never sexually harassed and sexually assaulted by*

23   ~~*Bernadette Komasi, and Delta has intel that Erika committed workers compensation fraud*~~

24   ~~*because she never hurt her back at LAX airport."*~~

25   **405.**   Plaintiff first discovered in February 2021 that Def. Delta and/or Delta's HR Manager

26   Danielle Kruit was publishing ***and/or republishing*** unprivileged, false, defamatory per se

27   statements of purported facts about Plaintiff to Def.Delta's HR Manager David Needham and/

28   or other third parties that *"Erika Lee is a liar and a fraud, who was never sexually harassed*

**THIRD AMENDED VERIFIED COMPLAINT FOR DAMAGES**